THE AMERICAN DOCK AND IMPROVEMENT CO. et al.

*v.*

THE TRUSTEES FOR THE SUPPORT OF PUBLIC SCHOOLS et al.

1. A statute provided that any lands of the state under tide-water, or that might theretofore have been under tide-water, which should happen to come within the location of the route, or of the depots, stations or other works of a certain railroad company, or which should be needed therefor, should be paid for by the company to the trustees of the school fund of the state; that the boundaries and price thereof should be fixed by the riparian commissioners; that the price should be paid prior to any filling or improvement thereon authorized by the act, and that on such payment the title to the land should vest in the company in fee, and that a deed therefor might be made by the riparian commissioners, governor and attorney-general, in the name and under the great seal of the state.—*Held*, that on the trial of an action of ejectment, a deed under the great seal of the state, purporting to convey land of the state in pursuance of the statute, was, of itself, competent evidence, without proof, that the previous steps leading to the vesting of the title had been taken when the deed was made.

2. Also, that evidence offered by the defendants in the action to show that the lands conveyed by the deed did not come within the location of the road or of the depots, stations or other works of the company, was properly excluded.

3. The pre-emption given by the eighth section of the riparian act of 1860, to the riparian owner, is of grace, and not of right.

4. The thirteenth section of that act was designed for the benefit of riparian

owners who, after notice, neglected to apply for the grant, and the grant has consequently been made to some one else, and the right of the riparian owner to compensation is by the act made to depend upon whether, in law, he had such a right or interest as would make compensation to him necessary in order to enable the state to make the grant.

5. The legislature had the power to rescind the provision for pre-emption, and in the case of the West Line grant it did so by the special grant above mentioned. It had also the power to repeal the provision for compensation.

6. The West Line grant was not in violation of the constitutional prerogative of congress to regulate commerce with foreign nations and among the several states.

7. Where both parties claim under a grant from the state, the question whether congress has jurisdiction is neither material nor pertinent.

8. A railroad company may buy land in fee and hold it, and if the company becomes insolvent the property will be assets for the payment of its debts.

9. If the property, by reason of forfeiture, revert to the state, it alone can take advantage thereof.

10. Where the facts are undisputed, and the cause is to be decided upon mere questions of law, it is not error for the court to direct the jury what verdict to find.

Bill for relief. On motion on behalf of complainants to set aside the verdict rendered on the trial of the issue at law, and motion on the part of the receiver of the West Line Railroad Company for a final decree upon the verdict.

Charge of the court by *Depue, J.*:

This suit is an issue out of the court of chancery. The chancellor directed that the issue should be "Whether the New Jersey West Line Railroad Company, at and after the date of the delivery of the deed from the state of New Jersey to said company, referred to in the pleadings in this cause, which was on or about the 19th day of March, A. D. 1872, had the legal title and right of possession to all or any part of the land described in and purporting to be conveyed by the said deed; and if only to a part, to what part."

The order of the chancellor, and the statute in virtue of which it was made, both contemplate the trial, upon such an issue, of the legal title in accordance with the rules and practice of courts of law for the determination of titles to land.

A careful examination of the case has led to the conclusion

that there are no disputed questions of fact material to this issue which I can submit to the finding of the jury. I cannot find in the case made here any question arising under this issue except questions of law to be decided by the court. The counsel have so treated the case in their summing up.

The property in controversy is of considerable value, and the legal questions discussed by counsel are of the utmost importance. If this were an ordinary issue out of the supreme court, I would take a special verdict, or direct a verdict under formal instructions, and leave the decision of the case to the supreme court. But that course of procedure is not open to me in the trial of this issue. The chancellor has defined the issue, and has directed that it be tried in this court, and the only return that can be made to the court of chancery is a certificate of the finding of the issue at a trial in this court. The situation of the case has put upon me the duty to decide here upon the rules of law that are supposed to enter into the settlement of the title to the premises in dispute, and upon the application of those rules to the facts of this case. My endeavor will be to present the case with such directness that if I fall into any error in either respect, the error will manifest itself when the proceedings are brought under review; so that in any event the necessity for a retrial may be obviated.

The premises lie between the original line of high water of Communipaw bay and the centre line of Washington street extended. They comprise lands lying between high and low water, and also lands below low water, extending out into the bay into deep water.

Before considering the claims of title of the parties respectively, it will be useful to state the rights of the state in property so situated.

By the common law of England, the title to lands under tidal waters, below the line of ordinary high water, was vested in the crown. In such lands the king had a double right—a right of jurisdiction for the purposes of government, and a right of property and ownership—the former as part of the prerogatives of

the king as sovereign, the latter as part of the *jura regalia* of the crown.

These rights in lands under tide waters in the province of East Jersey were granted by Charles II. to the Duke of York by the charters of 1664 and 1674, and the land or soil under such waters passed to the Duke of York, to be held by him in the same manner as the soil under the navigable waters of England was held by the crown. These rights, as well the right of property in the soil under tidal waters as the right of sovereignty, were transferred by the Duke of York to the proprietors, and by the surrender in 1702 were restored to the crown; and when the people of New Jersey took possession of the government and assumed the powers of sovereignty, the prerogatives and *jura regalia*, which before belonged to the crown or to parliament, became immediately vested in the state. Among the rights of the crown to which the state succeeded was the right of property in the soil under tidal waters, and the title of the state in such lands is proprietary in its fullest sense, including the power to grant and convey them to individuals, to be held in private ownership. *Martin* v. *Waddell, 16 Pet. 367; Den, Russell,* v. *Jersey Company, 15 How. 426; Arnold* v. *Mundy, 1 Hal. 1; Gough* v. *Bell, 2 Zab. 441, 3 Id. 624; Stevens* v. *P. & N. R. R. Co., 5 Vr. 532.*

In *Gough* v. *Bell* the courts of the state, while affirming the title of the state in tidal waters below ordinary high-water mark, held that, by a local common law, the riparian owner—*i. e.*, the owner of lands bounded on tidal waters—might extend his improvements by wharves or filling up over the shore between high and low-water mark, unless prevented by the state; and that when he had so improved or reclaimed the shore, his title would extend to actual high-water mark. But this right of acquiring property in lands under tidal waters by improvement or reclamation was restrained within the limit of the ordinary low-water mark. In *Townsend* v. *Brown, 4 Zab. 80, 85,* Chief-Justice Green said that it had never been supposed or imagined that there was or could be, within this state, independent of leg-

islative grant, any individual ownership in the soil of the sea, or of the arms of the sea below low-water mark.

This right of the riparian owner to improve, and by reclamation to acquire a title, was not only limited to the space between ordinary high water and ordinary low water, but was also a mere license, revocable at the will of the legislature, which became irrevocable only when the license had been executed and the riparian owner had effected the reclamation. Before the reclamation was actually made the state might convey its lands to any one, either for public or private use, without making compensation to the riparian owner in front of whose lands the conveyance was made. *Stevens* v. *P. & N. R. R. Co.*, *supra*; *N. Y., L. E. & W. R. Co.* v. *Yard*, *14 Vr. 632–636*.

In 1851, the legislature regulated the subject by a statute commonly known as the Wharf act. By the first section of that act, it provided that it should be lawful for the owner of lands situate along or upon tide waters, to build docks or wharves upon the shore in front of his lands, and in any other way to improve the same, and when so built upon or improved, to appropriate the same to his own exclusive right. By the eleventh section, it defined the term "shore," as used in the act, to be the land between the limits of ordinary high and low water. By other sections, provision was made for enabling the riparian owner to build docks, wharves and piers in front of his land beyond the limits of ordinary low water, by a license to be granted by the board of chosen freeholders of the county in which the lands lay. This statute did not create any property rights in the riparian property-owner in lands fronting on his land. It conferred a mere license, revocable at the will of the legislature before improvement actually made under the privilege granted. *State, Roberts,* v. *Jersey City, 1 Dutch. 525 ; Stevens* v. *P. & N. R. R. Co.*, *supra*.

The wharf act of 1851 continued in force until the 31st of March, 1869, when the second riparian act was passed. It was not repealed or suspended by the riparian act of April 11th, 1864. By the riparian act of 1869, the wharf act was repealed as to the tide waters of the Hudson river, New York bay and

the Kill von Kull, and it was declared that such repeal should not be construed to restore any supposed usage, right, custom or local common law founded upon the tacit consent of the state or otherwise, to fill in any land under water below mean high tide, and that, without a grant or permission of the riparian commissioners, no person or corporation should fill in, build upon, or make any erections on, or reclaim any of the land under the tide waters within the limits above mentioned.

The repealing act of 1869, in its third section, provided that nothing in the act contained should operate to repeal or impair certain grants of land under water, or rights to reclaim, or to erect or build docks, wharves and piers which had been given by legislative acts, nor to impair any revocable license granted by the board of freeholders under the act of 1851, so far as the lands under water had been reclaimed or built upon under such licenses.

The act of 1869 authorized the riparian commissioners to make grants of lands under waters which had not been improved, and had not been authorized to be improved, under any grant or license protected by the provisions of the act; to designate the lands for which a grant is desired; to fix the price or annual rentals; to certify the boundaries, and to make conveyance therefor in the name of the state and under the great seal of the state.

This act also contained two provisions for the benefit of riparian owners. A proviso in the eighth section enacted that no grant or license should be granted to any other than a riparian proprietor until six calendar months after the riparian proprietors should have been personally notified in writing by the applicant for such grant or license, and should have neglected to apply for the grant or license, and to pay, or secure to be paid, the price that said commissioners had fixed. By this section the option to apply for and have a grant at the price fixed by the commissioners on the application of other persons—the preemption, so called—was given to the riparian owner as riparian owner, irrespective of the question of any rights on his part. The thirteenth section provided that, where a grant was made by

American Dock and Improvement Co. *v.* Trustees of Public Schools.

the commissioners to any other person than the riparian owner, ·the state's grantees were forbidden to fill up or improve the lands until the rights and interests of the riparian owner (if any he has) should be extinguished; and provision was made for the valuation of the rights and interests of the riparian owner (if any he has), on the payment of which his right and interest should be extinguished. This section was designed for the benefit of a riparian owner who, on notice given, had neglected to apply for the grant as he might have done under the eighth section, and the grant had therefore been made to some one else. And the right of such riparian owner to compensation was not given to him simply because he is riparian owner. His right to compensation in that event was made to depend upon whether, in law, he had such a right or interest as would make compensation to him necessary to enable the state to make the grant.

Enough has been said to show that the titles of these parties respectively to the premises in dispute to be subjected to examination, must be title derived from the state. The provisions of the wharf and riparian acts I have referred to will be needed in the investigation of the subject.

The plaintiff makes title under a grant by the state to the New Jersey West Line Railroad Company.

The defendants have no specific grant from the state for the premises. They claim title (1) as riparian owners; (2) under the wharf act of 1851; (3) under the act of 1860, authorizing the extension of the Central railroad; (4) under the act of 1864, incorporating the American Dock and Improvement Company.

By a supplement to its charter, passed February 29th, 1872, the West Line company was authorized to extend its railroad from its prior terminus in Essex county, " to some point in line with the most exterior line for solid filling, established in the Hudson river by the act of 1869, commonly called the Riparian Commission Act." The ninth section enacts:

"That any lands of the state under tide water, or that have heretofore been under tide water, which shall happen to come within the location of the route, or of the depots, stations or other works of the company, or shall be needed therefor, shall be paid for by the company to the trustees of the school fund of

this state; and the boundaries and price thereof shall be fixed by the riparian commissioners, on application for that purpose to them, and shall be paid as aforesaid, prior to any filling or improvement thereon herein authorized; and on such payment thereof, the title to such land shall vest in said company in fee simple, and a deed therefor may be made by said commissioners, governor and attorney-general, in the name and under the great seal of the state."

The deed of grant purports to have been made in pursuance of this section. It is under the great seal of the state, and signed by the governor, the attorney-general and the riparian commissioners. It is expressed in the formal language of common law grants, granting and conveying the premises to the West Line company, its successors and assigns, forever—that is, in fee simple. The deed is dated March 19th, 1872. It was acknowledged by the riparian commissioners May 20th, 1872, and deposited for record May 27th, 1872.

The cases are not agreed as to whether a deed will be presumed to have been delivered as of its date, or as of the date of the subsequent acknowledgment. The question happens to be of no importance at this time. If exact time was material, and the West Line grant was to be considered as a revocation of a license, I would be inclined to hold that it became operative, as such, only from the time of notice. Actual notice of the grant was given to the two corporation defendants on the 25th of May, 1872.

The deed recites that the premises granted and conveyed—

"Lie, in part, under tide water, and in part heretofore lay under tide-water, and happened to come within the location of the route, and of the depots, stations and other works of said company, and are needed therefor."

That the said commissioners, pursuant to the said ninth section, "and on application of said company," have fixed the boundaries as they are hereinafter described, and the price of such lands at the sum of $125,000; and that the said company have, pursuant to the directions of said act, paid to the trustees of the school fund of the state the said sum; and thereupon grants &c., to said company—

"All that certain tract of land, in part under tide water, and in part heretofore under tide water, in Jersey City, in the county of Hudson, and state of New Jersey"—[describing the premises as in the declaration.]

The ninth section of the West Line charter is not of itself a grant; but it is manifest that the legislature contemplated that the lands granted might be in the location adopted. That, I think, is apparent from the description of the authorized extension of the company's railroad, "to some point in line with the most exterior line for solid filling," as contained in the first section—from the restriction on the company, contained in the second proviso in the fourth section, which exactly fits on the grant as made, and from the fact that the legislature, by an act passed at the same session as the West Line supplement, and approved April 4th, 1872, established a public basin, conforming in its southerly line to the West Line grant, and by another act, approved the same day, authorized the riparian commissioners "to make changes in any basin now fixed and established"—a provision suited to clear the way for the West Line grant—the same having been located almost entirely within the basin delineated on the commissioners' map of 1865.

The defendants contest this grant (1) on the ground of its own inherent invalidity, and (2) on the ground that they had previously acquired rights in the premises which disabled the state from making the grant.

The contentions under the first head are—

*First.* That the grant to the West Line company is in violation of the constitutional prerogative of congress to regulate commerce, and its jurisdiction over navigable waters capable of being used for foreign or inter-state commerce. Ever since the decision of *Wilson* v. *Black Bird Creek Co., 2 Pet. 245,* it has been regarded as settled that the power of congress does not exclude the jurisdiction of the state over navigable waters within its boundaries, and that a state law on this subject is not invalid, unless congress has acted and the state law is in conflict with the congressional regulations or interferes with the rights which are permitted by them. I do not consider the several acts of congress cited, making appropriations for the improvement of New

27

American Dock and Improvement Co. *v.* Trustees of Public Schools.

York harbor, as congressional legislation of such a character as
would conflict with the right of the state to make the grant.

*Second.* That the conditions on which the legislature author-
ized the grant were not complied with. I admitted the grant in
evidence without proof that the conditions were complied with,
and excluded evidence that the company's location was such as
not to justify the grant. I adhere to the views then expressed.
The conditions were such as concerned only the state. The state
selected its officers as the persons to ascertain whether the condi-
tions on which the grant was authorized existed, and empowered
them to make a deed in the name of and under the great seal of
the state, as evidence of the grant. The deed so authenticated
executed the grant. If there was any deception or fraud in pro-
curing this grant, relief is exclusively at the instance of the
state, either by *scire facias* to vacate the grant, or by entry, or
by a subsequent grant of the same premises. *Field* v. *Seabury,
19 How. 323; White* v. *Burnley, 20 How. 235; Spencer* v.
*Lapsley, 20 How. 264; Schulenberg* v. *Harriman, 21 Wall. 44–
62; Farnsworth* v. *M. & P. R. R. Co., 92 U. S. 49–66; 4
Abb. Dig. 750, tit. "Patents for Lands"* § *1.* The defendants
are not in position to represent the state in such a proceeding.

*Third.* That the grant to the West Line company has be-
come inoperative by reason of the forfeiture of its charter. The
sixth section of the original charter, passed March 29th, 1865,
provided that, if the railroad thereby authorized should not be
completed at the expiration of ten years from the 1st day of
July then next, the act should be void, except as to the part com-
pleted. The company completed only a small· portion of the
road originally authorized, and has done nothing on the exten-
sion except to take a grant of these lands. The limitation was
reached in July, 1875. The limitation had not expired in 1872,
when this grant was made. The grant was made on a consider-
ation paid, and it was expressly provided that, on compliance
with the conditions—all of which were precedent to the consum-
mation of the grant—the title should vest in fee simple. If the
title which so vested became forfeited and lapsed by·matters *ex
post facto,* the land, if not held in trust for creditors and stock-

holders, reverted to the state, and proceedings to enforce the forfeiture and resume the title could be taken only by the state. *Farnsworth* v. *M. & P. R. R. Co., supra.*

Nor will the fact that the West Line company has since become insolvent, and its franchises have been sold to purchasers who have re-organized, defeat the grant. On the dissolution of a corporation, its property constitutes a trust fund for the payment of debts and stockholders. *Boone on Corp. 207 ; Rev. p. 187 § 59.* And if, by the extinguishment of the corporate existence of the company, the project for which the state allowed this grant is dissipated, and the condition implied from the grant broken, so that the lands revert, the remedy to recall the grant is with the state. Nor does the question arise whether the legal title to the lands vested in the receiver. The chancellor selected the parties in whose names the issue should be tried. He might have selected fictitious or nominal parties for the purpose. For convenience, he made the receivers of the two corporations parties to stand upon the record.

*Fourth.* That the West Line grant was made in violation of the right of pre-emption conferred on riparian proprietors by the proviso in the eighth section of the riparian act of 1869. The defendants, or some of them, are owners of the *ripa* from the sugar-house around to the lands on which the Central railroad is constructed. Their ownership includes the *ripa* at the shore-end of the West Line grant, and the whole *ripa* adjacent on the northerly side of the grant. No question of apportionment, as between the several owners of *ripa* on a bay or cove, arises ; and it is admitted that no notice of the application for the grant, and no option, was given to them to purchase for the price fixed. On the argument, I intimated to counsel that that right could not be litigated in this case ; that the remedy was in equity. *Johnson* v. *Towsley, 13 Wall. 72–83 ; Sampson* v. *Smiley, Id. 91,* give countenance to that view. Subsequent reflection has brought me to a different conclusion. The conditions the state has imposed upon its riparian commissioners are conditions precedent ; unlike the conditions for making the West Line grant, they are conditions for the benefit of riparian proprietors, and the legis-

lature has prescribed that no grant shall be made to any other than a riparian proprietor unless these conditions have been complied with. The first section of the limitation act of 1789 provided that no new survey, within the reputed boundary of lands, should be of any avail, unless it should be made to appear that the possessor of such lands, holding the same by survey, deed or otherwise, had been notified for the space of six months previous to the making of such survey of the intention to make it, and had refused or neglected to re-survey and cover such overplus land. *Rev. p. 599 § 27.* And it has always been considered that the person entitled to this pre-emption might defend at law on the ground of want of notice. I think that, under the chancellor's order for this issue, such of the defendants as are riparian owners may contest the West Line grant here on the ground referred to.

The question, then, arises whether a grant such as was made to the West Line company, is subject to the conditions to which grants by the riparian commissioners, under the act of 1869, were subjected by the eighth section of that act. That the benefits conferred on riparian proprietors by that section are revocable at legislative will is apparent from the reasoning of the chief-justice in the Stevens case. The legislature might, therefore, authorize a special grant of lands under water not in conformity with the requirements of that act. *The Yosemite Valley Case, 15 Wall. 77.* I think the West Line grant is a grant of that character. The act of 1869 is a general act, designed to facilitate the sale of lands of the state under water simply for public revenue, and indifferently to any one who desired to purchase. In such a scheme the legislature very properly preferred the riparian owner, who was willing to pay the price, to any other purchaser, and therefore gave the riparian owner the preference and the option to buy at the price fixed. The lands comprised in the West Line grant consisted, in great part, of lands that had been withdrawn from sale and set apart for public use—lands which were outside of the exterior lines and within the basin delineated on the commissioners' map of 1865.

The act of 1872, under which the West Line grant was made,

American Dock and Improvement Co. *v.* Trustees of Public Schools.

is a special act—a supplement to the company's charter. Its object was not to put lands previously withdrawn from sale in the market, to be sold to augment the public revenues. It was designed exclusively to aid the West Line company, by enabling it to purchase lands of the state in order to get an outlet on tide waters. It authorized a grant to that company, and to that company only, and made the location of its route or of its depots, stations or other works, the need therefor of the lands selected, and the payment of the price fixed, the conditions on which the title thereto should vest. The taking of the lands selected for that purpose by any one else than the company, would defeat the legislative purpose in this respect. The legislative intent, by the act of 1872, cannot be made to harmonize with the legislative plan for the sale of the state's lands adopted by the act of 1869. The two acts cannot stand together, and therefore the act of 1869 is subject to that rule of construction that a general statute must give way to a special statute, so far as the provisions of the latter are inconsistent with the former. *Industrial School District* v. *Whitehead, 2 Beas. 290 ; Jersey City* v. *J. C. & B. H. R. R. Co., 5 C. E. Gr. 360.*

I have now examined the several objections made to the West Line grant, and find no infirmity in the grant which would impair its validity as a grant, if the state had the power to make it.

The defendants contend that the state had no such power. They insist that they had previously acquired rights in the premises, which prevented the state from making the grant. I will now consider the grounds on which this contention rests. In making the investigation, I will confine myself to the issue of legal title. If there be equities which will overcome and subordinate the legal title, they remain in the court of chancery for its disposition.

The Central Railroad Company, by a supplement to its charter, passed February 20th, 1860, was authorized to extend its railroad from the city of Elizabeth " to some point or points on New York bay, in the county of Hudson, at or south of Jersey City." On the 27th of April, 1863, the company filed a location of the

route of its extension, to a point near Communipaw road. This location did not reach New York bay, nor the shore of Communipaw bay. On May 19th, 1863, the company filed another location, from the ending point of the location last named, to a point on the channel of the Hudson river, about eight hundred and ninety-two feet easterly of the centre of Hudson street produced. The route adopted by these locations was on a line at right angles to the shore of Communipaw bay, and extended about five thousand five hundred feet from the shore line. The terminal point was within the boundaries of Jersey City. This line of location was parallel with and four hundred and fifty feet south of the southerly line of the West Line grant. The company began the construction of its railroad over Communipaw bay, on its located route, in June, 1863. In August, 1864, the work was in such a condition that the company began to run passenger trains to the bulkhead, at the bay front, to connect with ferryboats running to New York city.

The American Dock and Improvement Company was incorporated April 11th, 1864. At that date the Central Railroad Company had acquired the whole of the shore front between Communipaw lane and lands of Gilbert, Hodges and Hoy, known in this case as the Hoy tract, and also considerable portions of the shore front between Communipaw lane and the sugarhouse lot, between Washington and Warren streets, in Jersey City. Between April 11th, 1864, and October, 1866, the Central Railroad Company acquired the title of the riparian-owners between the limits last mentioned, with the exception of a lot belonging to one Arbuckle, which he conveyed to the dock company on the 2d of October, 1866—except that the railroad company had acquired only an undivided one-half interest in so much of the shore front of the Jane Van Horne tract as lay north of the one hundred feet which the company purchased of her for its track. The location of this Van Horne tract appears on Mr. Clark's map, Exhibit No. 64.

By two deeds of conveyance, bearing date September 24th, 1866, and October 15th, 1866, the Central Railroad Company conveyed all its shore front to the dock company—taking back

from the dock company a deed for a strip of land one thousand and eighty feet wide, being the strip on which the tracks of the Central railroad leading to the bulkhead in front were laid. The northerly line of this strip is coincident with the southerly line of the West Line grant. The two deeds of October 15th, 1866—the one from the Central Railroad Company to the dock company, the other from the dock company to the Central Railroad Company—were parts of one agreement between the two companies, and are to be regarded as one transaction.

The situation of the title to the *ripa* after the conveyance of October 15th, 1866, was this, viz. : Jane Van Horne and the dock company were joint owners of so much of the *ripa* as lay between the middle of Mill creek and the southern line of the shore end of the West Line grant. The Central Railroad Company was the owner of the tract one thousand and eighty feet wide, before mentioned, which lay next south of the southerly line of the West Line grant, and the dock company was owner of all the rest of the *ripa,* extending from the sugar-house around to Cavan Point.

A short time prior to the conveyances of October 15th, 1866, the Central Railroad Company had become the owner of the entire capital stock of the dock company, and the officers and managers of the two companies were the same persons.

At a meeting of the directors of the Central Railroad Company of October 15th, 1866—the same meeting which authorized the conveyance—it appears by the minutes that "a plan and map for the improvement of the property of the two companies was submitted and approved;" and at a meeting of the directors of the dock company of November 9th, 1866, similar action was taken by them.

Prior to the arrangement of October, 1866, the Central Railroad Company projected a general plan of improvement in Communipaw bay, which was modified by changes and additions from time to time. The details of this plan appear on Clark's map, Exhibit No. 64. In the latter part of 1866, I think in December, the company adopted a plan for a basin. This basin includes part of the lands embraced in the West Line grant. Its

southerly line is one hundred and eighty feet north of the southerly line of the West Line grant, and its northerly line is two hundred feet north of the northerly line of the West Line grant. The location of this basin and of the West Line grant, the basin of 1865, and the tide-water basin of 1872, appears on Map F.

After the arrangement of October, 1866, work was begun for the construction of this basin, and before March 19th, 1872, the date of the West Line grant, considerable had been done towards accomplishing that object, by sinking cribs and dredging out within the lines of the cribs. The location and condition of these cribs appear on Map P, with the dates when the several parts of the cribbing were begun and completed. It is apparent from this map and the testimony that, in March, 1872, so much had been done towards the construction of this basin and the appropriation of the lands within it, that, if the work was done under a license from the state, the license had at that time been so far executed as to have become irrevocable. The work was done under the auspices of the two companies, and avowedly under the charter of the dock company. On the 26th of February, 1867, the Central Railroad Company filed a location of a branch of its railroad upon the cribwork, on the northerly side of this basin.

In addition to the work I have just referred to, there was also work done in West Central avenue, west of Jersey avenue, by filling in, part above and part below the line of low water. This work is designated on Map N as " No. 4." It was done between 1863 and October, 1868, and is within the extreme southerly line of the West Line grant. This work appears to have been done by the Central Railroad Company under an agreement with Jane Van Horne.

The reclamation in West Central avenue, which I have just referred to, was effected while the wharf act of 1851 was in force. On the principles I have stated, the riparian owner acquired an indefeasible title to so much of the land so filled in and reclaimed as lay above ordinary low water. It contains twenty-seven hundredths of an acre. The description of this parcel appears on Exhibit 91.

For the lands between high and low-water mark, not reclaimed

when the wharf act was repealed, and all the lands improved below low-water mark, the defendants have no title unless the improvements upon them were made under some grant or license emanating from the state. The defendants make their claim of right therein under the act of 1860, authorizing the extension of the Central railroad, and the act of 1864, incorporating the dock company. On the construction of these two statutes the defendants' right to the premises just mentioned depends. The problem is whether, in these two legislative acts, or either of them, there is any grant, or, what is the same thing, license executed, which is applicable to the lands in controversy.

Public grants, whether they be of lands or franchises, are strictly construed. Herein public grants differ from grants between private persons. Grants between individuals are construed favorably for the grantee. Public grants are construed most favorably for the public and against the grantee. The grantee takes nothing not clearly given.

The construction of such grants as applied to public lands arises in two classes of cases. First, where the legislature has granted to a corporation a franchise which is a unit, such as for the construction of a railroad between two designated points. In such cases the grant of the franchise will, under some circumstances, carry with it, by implication, power to interfere with other public rights, and the right to use public property, without any special grant to that effect. Thus, in *Attorney-General* v. *Stevens, Sax. 370*, the defendants had the power to lay out and construct a railroad from the Delaware river, at some point or points between Cooper's creek and Newton creek, to some point or points on Raritan bay, and the power to build bridges; but no express authority was given to erect bridges over navigable streams. Chancellor Vroom held that the construction of bridges over navigable streams between the termini being necessary to effect the object of the incorporation, the power to construct them was given by necessary implication. In a more recent case, Chancellor Zabriskie held that an act authorizing a railroad company to extend its railroad across the Raritan river by a bridge, gave the company a right to use the lands of the

state under water for the purpose of constructing the bridge. *P. R. R. Co.* v. *N. Y. & L. B. R. R. Co., 8 C. E. Gr. 157.* The principle on which cases of this class were decided is, that the legislature, having designated the beginning and ending points, indicated a purpose to empower the construction of a railroad between the designated points, and lands of the state lying intermediate between those points, not being subject to condemnation under the usual powers to condemn, the whole project would be defeated if such lands could not be used without a condemnation being effected. But this right to use public lands arising from an implication created by necessity, arises only in cases of necessity, and is restricted within the limits of the necessity. Chief-Justice Beasley, speaking on this subject in a case of this kind, said that " the state is never presumed to have parted with any of its property in the absence of conclusive proof of an intention to do so ; such proof must exist either in express terms or in necessary implications." *Stevens* v. *P. & N. R. R. Co., 5 Vr. 532, 553.*

The other class of cases is that in which an individual, or, what is the same thing, a corporation created to hold and improve lands, with franchises adapted to the purposes for which the corporation was created, claims title to public lands under a grant from the public. In such cases the grant is most strictly construed, and the grantee takes nothing that is not expressly given. The earlier English cases are cited in the opinion of the United States Supreme Court, in *United States* v. *Arredondo, 6 Pet. 691, 738.* A later case in the same court is so pertinent to this subject, both in its facts and in the principles of construction adopted, that I will content myself with a reference to it. An act of congress enacted—

" That there be  *  *  *  granted to the territory of Iowa, for the purpose of aiding said territory to improve the navigation of the Des Moines river from its mouth to Raccoon Fork,  *  *  *  one equal moiety  *  *  * of the public lands  *  *  *  in a strip five miles in width on each side of said river."

The question was whether this grant gave the territory one

moiety of all the lands on both sides of the river up to its source, or was confined to lands lying between the fork of the river and its mouth. The court held the latter, and Mr. Justice Davis, delivering the opinion, said : " All grants of this description are strictly construed against the grantees; nothing passes but what is conveyed in clear and explicit language ; and as the rights here claimed are derived entirely from the act of congress, the donation stands on the same footing as a grant by the public to a private company, the terms of which must be plainly expressed in the statute, and if not thus expressed, they cannot be implied." *Dubuque & P. R. R. Co.* v. *Litchfield,* 23 *How.* 66–88. Equally explicit is the language of Chief-Justice Green, in *Townsend* v. *Brown, 4 Zab. 80,* and of the Master, in *Morris Canal and Banking Co.* v. *C. R. R. Co., 1 C. E. Gr. 419 ;* and the general doctrine to the same effect, as applicable to all public grants, is stated by the chancellor in *D. & R. Canal Co.* v. *R. & D. B. R. R. Co., 1 C. E. Gr. 321,* and by Mr. Justice Van Syckel, in *Black* v. *D. & R. Canal Co., 9 C. E. Gr. 455.*

The act of 1860, authorizing the extension of the Central railroad, is an act of the class first mentioned. It provided that for the purpose of the extension in its construction, completion, maintenance, use and enjoyment, all and every provision of the original act, which was passed February 26th, 1847, and is entitled "An act to incorporate the Somerville and Easton Railroad Company," and of the several supplements thereto, should extend and be applicable to the railroad authorized to be constructed, in every respect, as if the same had been originally authorized under the said act. By section 7 of the supplement of 1854, it was made lawful for the company to alter the location of its railroad, or to locate new lines when additional tracks should be required, at any point or points between Phillipsburg and Elizabethport, not varying, in any case, over one mile from the line as located and filed ; and by the first section of that supplement it was made lawful for the company to—

" Erect, build or extend such wharves, docks or piers opposite to and adjoining any lands owned by them, in the township of Elizabeth, as far in the sound or bay as may be necessary for the purposes of facilitating the transhipment

American Dock and Improvement Co. *v.* Trustees of Public Schools.

·of coal, and their general transporting business; and also to have and hold whatever wharves, piers, lands or lots, steamboats, sailing vessels, and such ·other facilities, in the·city of New York, or elsewhere, as may be necessary for the management of their business."

It is obvious that no grant of lands of the state can be implied from the company's power to locate and construct branch roads. It is only where a terminus *ad quem* is fixed by the legislature, to reach which lands of the state are necessary, that a grant by implication ever arises. If a grant of lands of the state would be implied from such a power to construct branch roads, the company could, with the consent of riparian owners, take for that purpose any of the state's lands in the counties of Hudson and Union, which lie within one mile of its main track. No precedent can be found, in which it has been held that a grant of public lands has been implied from a grant of corporate powers expressed in general and indefinite terms. The cases are all the other way.

Nor will a grant of lands of the state be implied from the grant of powers with respect to wharves, docks and piers contained in the first section of the act of 1854. The power to *erect, build or extend* wharves, docks and piers in that section, is restricted to such structures opposite to and adjoining lands owned by the company at Elizabethport. The residue of the power is simply *to have and to hold* wharves, piers, lands or lots, steamboats, sailing vessels and other facilities in the city of New York or elsewhere, necessary for the management of its business —a grant of franchises only.

The company's right to occupy lands of the state in this locality must therefore be found in the terms in which the extension of its railroad was expressed in the act of 1860. The terminus designated was " some point or points on New York bay, in the county of Hudson, at or south of Jersey City." The route located by the location of May, 1863, extended over Communipaw bay a considerable distance, and the ending point of the location was in Jersey City. The location conformed to the legislative description. If it was unfairly made, the state had remedy by injunction. *Attorney-General* v. *Stevens, supra.* The

company began the construction of the road in 1863 and completed it in 1864. In 1870 the state intervened by an information filed by the attorney-general. Pending the information suit, it would not be proper, nor is it necessary, for me to express any opinion as to the legality of that location or of the rights of the company in the lands occupied in the construction of its track under the location. The line of this location is four hundred and fifty feet south of the West Line grant. In October, 1866, the company conveyed all its lands in that locality to the dock company, taking back a deed for a strip one thousand and eighty feet wide, extending to the bulkhead in front. The northerly line of this strip is coincident with the southerly line of the West Line grant. This strip of land is amply sufficient to answer the needs of the company of the means of access with its railroad to the terminus, on the channel of the Hudson river; and the necessity which raises a grant by implication circumscribes the bounds of the grant implied.

The two locations of April 27th and May 19th, 1863, are together a location of the extension of the company's railroad from Bayonne to the channel of the Hudson river. They are so described in the certificates filed. The company having located the line of its extension by the two locations last named, and completed its road and put it in use, its power in that respect was exhausted. *Morris & E. R. R.* v. *C. R. R. Co., 2 Vr. 205.* The subsequent location of February 26th, 1867, was not a change in the location of the main line of the extension. It was a location of branch tracks, and is so described in the certificate filed; and, as I have already said, the grant of power to construct branch tracks is not so expressed as to carry with it by implication a grant of public lands for that purpose.

I come now to the charter of the American Dock and Improvement Company. This charter was granted April 11th, 1864. The eighth section provides—

"That, unless the aforesaid improvement shall be commenced within one year from the passage of this act, then this act shall be null and void." .

It was insisted that this act had been avoided by the failure

of the company to begin the improvement within the year. The point was not taken until the evidence had been closed. If the point were tenable, I would open the case for further evidence on the subject. The year expired April 11th, 1865. The commissioners to measure the shore front granted to the company, were appointed by the governor on the 28th of August, 1865, and the state received the consideration money of the grant in November, 1866. Besides that, the fourth section of the riparian act of 1869 unmistakably recognizes the existence of the dock company. The state may waive the condition; and if it does, third persons cannot complain. *State* v. *G. & P. Road Co., 15 Vr. 496.* From these acts I think a waiver may be inferred. Nor was the charter of the dock company suspended or affected by the riparian acts of 1864 and 1869. Its rights, whatever they were, as conferred by its charter, were saved by the provisos in the second section of the act of 1864, and the third section of the act of 1869, that no provision in the act should "in anywise repeal or impair any grant of land under water or right to reclaim made directly by legislative act," and the succeeding words in that proviso. The rights of the dock company under its charter still subsist, and the question is only one of construction.

The dock company was incorporated for the benefit and advantage of the corporators; that is apparent from the preamble of the act and its provisions throughout, especially by the seventh section, which gives the company a right to make wharfage and dockage charges. The interest of the public in the execution of the company's works was incidental—just such an interest as the public always has in improvements for public convenience and private emolument, made either by private or corporate enterprise. Its charter is a grant of the class secondly above named, and must be construed by the rules of construction applicable to such grants.

The preamble recites that—

"Whereas, it is represented that John S. Gilbert, Preston H. Hodges, James Hoy, Henry L. Gilbert and Moses B. Bramhall, and others their associates, now own certain tracts of land situate in the townships of Bergen and Greenville, in the county of Hudson, and desire to acquire from the state other tracts

of land contiguous thereto, covered by water, which they desire to fill in and reclaim from the water, and to divide into suitable building and other lots, and to sell and dispose of the same for the benefit of the association, with the object of erecting a town, with docks, wharves and bulkheads, so as to afford facilities to secure to this state a portion of the commerce and shipping of the city of New York; and whereas, it is necessary for the success of their undertaking that they should be able to convey the said premises, from time to time, to such persons as may be desirous to purchase, notwithstanding death or other cause affecting the individuals owning or who may own the said land, and in order to give greater efficiency and concentration to their efforts for the improvement of the said land."

By the second section the persons named in the preamble, and such persons as they may associate with them, are incorporated in the name of the American Dock and Improvement Company. Section 5 provides—

"That as soon as the said company shall be organized, it shall be authorized to receive conveyances for the lands now owned as aforesaid between the south line of the lands of 'The Central Railroad Company of New Jersey,' where it intersects the New York bay and Cavan Point, and to hold and execute all instruments and conveyances necessary for the purchasing, leasing or selling of such property; and the said company are hereby authorized to purchase and hold any lands adjoining or near the above-mentioned tracts, which they may deem necessary for improving and enlarging said property, and to pay for all lands with the shares of its capital stock, at such price as the company may deem best for its interest; *provided*, that they shall not hold, at any time, over two hundred acres, above the present high-water mark, in addition to the tracts mentioned in this section."

By section 6 it is enacted—

"That the said company shall be, and hereby are, authorized to improve all and every portion of the said lands under water held or purchased by them as aforesaid, by erecting buildings and laying out said lands into lots, streets, squares, docks, lanes, alleys or other divisions, and by leveling, grading, raising or tunneling the said land, streets, lanes and alleys; and they shall have liberty to fill up, raise, occupy, possess and enjoy as their own property, all lands covered with water which they may hold or purchase, or which may lie in front of any lands which they may hold or purchase, and may build, enlarge or improve (or sell and convey to others to improve) all and any land or lands under water, wharf or wharves, bulkhead or bulkheads, piers, slips and other structures which they may deem necessary for commercial, shipping or other purposes; *provided*, that in carrying out the provisions of this act,

they shall not injure the navigation of the Hudson river, nor interfere with the legal rights of others, nor build out beyond the easterly line of Hudson street, in Jersey City, extending southerly, or such other exterior line as may be fixed by law, and that the southerly line of the said improvement into the bay shall be on a line commencing on the southerly side of Cavan Point, at the boundary line of lands of late belonging to Stephen B. Vreeland, and at the point where said boundary line strikes the shore of New York bay, and from thence, running south forty-six degrees and thirty-nine minutes east, to the channel of the Hudson river; *provided,* that the northerly line shall be parallel to and with the said southerly line."

A proviso annexed to this section provides—

"That nothing contained in this act shall be so construed as to give the said company any power to make any improvement whatever upon the tract of land under water in New York bay, heretofore granted to Aaron Ogden, without the consent, in writing, of the said Aaron Ogden, or his legal representatives."

The eleventh section provides—

"That the said company shall pay to the treasurer of this state, on or before the 1st day of July, A. D. 1885, the sum of $25 for each and every foot of the shore embraced and contained in this bill, the amount of the same to be ascertained by a commission to be appointed by the governor, and the extent of the shore front is to be ascertained and measured as follows: Commencing at a point on the southerly side of Cavan Point, at the boundary line of lands, of late, belonging to Stephen B. Vreeland, and at the point where said boundary line strikes the shore of the New York bay, and thence northerly in a straight line to the south line of the lands of the Central Railroad Company of New Jersey, where it intersects the New York bay; and upon the aggregate amount so ascertained as aforesaid, the said company shall pay to the state interest from the 1st day of July, 1865, at the rate of six per centum per annum, payable semi-annually; and the said aggregate amount so ascertained as aforesaid shall be and remain a lien upon said lands until the payment of the same with the interest thereon; and a certificate of the said commissioners, signed by them and the president of said company, of the measurement of the shore line made as aforesaid, shall be filed in the office of the secretary of state."

The twelfth section declared that payment of a proportionate part of the purchase-money referred to in the eleventh section, should release from the lien therefor a corresponding proportionate part of " the lands under water, embraced and contained in this bill."

The contention of the defendants is that the dock company, by its charter, acquired by actual grant the lands of the state under water between Cavan Point and the south line of the lands of the Central Railroad Company at Van Horne's creek, lying between the lines delineated on Map C as the northerly and southerly lines of the grant, and, in addition thereto, the power to purchase other lands not within the limits mentioned, with a license to improve and appropriate to its own use all lands covered with water lying in front of any lands the company might hold or purchase; and that, the license having been executed by the improvement and appropriation of the *locus in quo*, before the grant to the West Line company, the title of the dock company to the premises became fixed, and could not be impaired by a subsequent grant by the state.

The eleventh section of the charter of the dock company, in fixing the compensation to be paid to the state for "the shore *embraced* and *contained* in this bill," required that the extent of the shore front should be ascertained and measured, commencing at a point on the southerly side of Cavan Point, at the boundary line of lands of late belonging to Stephen B. Vreeland; thence northeasterly in a straight line to the south line of the lands of the Central Railroad Company. The Central Railroad Company, at that time, owned all the lands along the shore between Communipaw lane and Van Horne creek, and the northern terminus of the measurement, as well as the northerly line of the grant, was as definitely fixed by the reference to lands of the Central Railroad Company as if the reference had been to a fixed monument. The commissioners, measuring between those points, ascertained the length to be four thousand five hundred and eighty-nine feet, and reported the same to the governor, with a map. The consideration of the grant—$25 a foot on this measurement, amounting to $114,715—the dock company paid in November, 1866, with the interest thereon.

The West Line grant is, at its nearest point, distant three thousand six hundred and sixty-five feet from the northerly point of the measurement of the dock grant by the commissioners; and between the West Line grant and the lands measured, is the

28

tract of the Central Railroad Company, one thousand and eighty feet wide, which, at the shore point, is seven hundred and thirty feet wide, and is used by the Central Railroad Company for its track and other railroad purposes.  The dock company claims that, by its charter, it obtained a license to reclaim and improve, for its own benefit, lands of the state under water as far north of the bounds of its actual grant as to include the location of the West Line grant, comprising between the shore line and the exterior line of the riparian commissioners, several hundred acres of lands under water, and that, having regard to the basis on which the consideration for the grant was estimated, this license to reclaim and appropriate lands of the state was given as a gratuity.  A claim of such magnitude against the state should not be supported on doubtful or ambiguous words.  *Townsend* v. *Brown, 4 Zab. 80.*  To adopt the language of the supreme court of the United States, the right must be so clearly defined that there can be no question of the purpose of the legislature to confer it.  *Leavenworth R. R. Co.* v. *United States, 92 U. S. 733.*

. The dock company's claim of right in this respect rests upon the fifth and sixth sections of its charter.  The fifth section, after authorizing the company to receive conveyances for lands then owned as aforesaid (that is, by the promoters of the company) between the south line of lands of the Central Railroad Company and Cavan Point, enacted that " the said company are hereby authorized to purchase and hold any lands *adjoining* or *near* the above-mentioned tracts which they may deem necessary for improving and enlarging said property."  The sixth section authorizes the company to improve all and every portion of the said lands under water held or purchased by them as aforesaid, by erecting buildings, laying out streets &c., and further, enacts that " they shall have liberty to fill up, raise, occupy, possess and enjoy as their own, all lands covered with water which they may hold or purchase, or which may lie in front of any lands which they may hold or purchase."

It is manifest that the foundation of the dock company's right in these premises rests on the words of the fifth section—" to

purchase and hold any lands *adjoining* or *near* the tracts above mentioned;" for the power given to the company by the sixth section to improve and acquire, by improvement, lands of the state, by reclamation and improvement, must be applied to such lands as the company was expressly authorized, in its charter, to purchase and hold. It cannot be so wide in its scope as to apply to lands which any corporation, by the general corporation law, is authorized to take and hold.

The words "adjoining or near," in the grant of power to purchase and hold, in the fifth section, are the words which give signification to the company's present claim. The word "adjoining" is wholly inapplicable to the lands in the West Line grant —separated, as the latter is, from the lands of the dock company, by a strip of land of considerable width, belonging to the Central Railroad Company, and essential for the use of that company for railroad purposes. The word "near" is a relative term, having no positive or precise meaning, and its import can be determined only by surrounding facts and circumstances. *2 Abb. Law Dict. p. 156 tit. "Near."*

The whole strip of land between Cavan Point and Van Horne creek once belonged to Stephen Vreeland. In 1848 an act was passed, authorizing him to build a dock or wharf in front of his lands, at Cavan Point, a sufficient distance into the bay for the accommodation of vessels navigating the same. *P. L. of 1848 p. 75.* In 1849, on his petition representing that, owing to continual encroachments of the waters of the bay, his landmarks had been destroyed, the legislature passed an act appointing commissioners to ascertain the metes and bounds of his lands covered by the waters of the bay, and declaring that their report should be evidence, so far as concerned the state, of his title to the lands designated and mapped out as belonging to him. The commissioners' map (Exhibit No. 78) shows that the lines designated were considerably below ordinary high water. On the 11th of April, 1864, when the act incorporating the dock company was passed, Gilbert and Hodges, two of the corporators named in the act, owned the undivided one-half part of the tract lying across the boundary line of the townships of Bergen and Greenville;

and Hoy, another corporator, owned the other undivided half. This tract is marked in red on Map C, and comprises about one-half of the shore front between Van Horne creek and Cavan Point. The shore front between the latter tract and Cavan Point was owned by Andrew Clerk, to whom it had been conveyed by Nicholas L. Vreeland and Stephen B. Vreeland, in separate parcels—Nicholas owning the shore front next to the tract in red, and Stephen owning from the lands of Nicholas to Cavan Point. In front of these lands, and within the lines indicated in the charter of the dock company, there was a tract of ten acres of land under water, which the state, in 1837, had granted to Aaron Ogden by metes and bounds. There were then, at the time this charter was passed, lands within the lines mentioned in that act, to which the words " adjoining or near " were appropriate, and the dock company, in fact, subsequently acquired title to those lands by conveyances—from Andrew Clerk for the two Vreeland tracts, and from Cornelison for the Ogden tract.

I think there are also indications in this act of a legislative intent adverse to the claim of right now made under it. The preamble recites that the individuals named and others, their associates, " now own certain tracts of land, situate " &c., " and desire to acquire from the state other tracts of land *contiguous thereto*, covered by water." It contains no other allusion to rights in the lands of the state ; and for every foot of land the state granted, it exacted a price—$25 a foot ; and by the proviso in the sixth section following, and therefore qualifying the words I have already quoted from that section, it is provided that the southerly line of said *improvement into the bay* shall be on a line commencing on the southerly side of Cavan Point, at a point where the boundary line of lands late of Stephen Vreeland strikes the shore ; and from thence running south, forty-six degrees and thirty-nine minutes east, to the channel of the Hudson river ; and that the northerly line shall be parallel to and with the said southerly line. The location of this northerly line is fixed at the south line of lands of the Central Railroad Company. The designation of these lines by a fixed course indicates

⁻a purpose to establish boundaries, and to limit the rights granted within prescribed bounds.    That purpose is further indicated in the eleventh section, which provides that $25 shall be paid "for ⁻each foot of shore *embraced* and *contained* in this bill," and that the extent of the shore front is to be *ascertained* and *measured* between the designated points.    This section made the price a lien "*upon the said lands*" until payment be made; and the ⁻twelfth section declares that payment of a proportionate part of the price should release from the lien a corresponding propor⁻ ⁻tionate part of "*the lands under water embraced in this bill.*"

Every word contained in the grant of power to purchase and hold lands for the purpose of improving and enlarging the property of the corporators will be satisfied by purchases within ⁻the boundaries designated in the act; and I do not find in the ⁻act that clear expression of intent that the company might, by purchases from shore-owners outside of those limits, appropriate lands of the state beyond those expressly granted, which is neces⁻ ⁻sary to create such a right against the state, and to enable the ⁻company to take the state's lands to an indefinite extent without making any compensation for them ; especially when the legisla⁻ ⁻ture indicated an intention not to donate, but to sell to the com⁻ pany, lands of the state at a fixed price per foot.

On the best consideration I could give this case, in the time ⁻afforded, I have reached the conclusions I have above stated.  If ⁻my judgment upon the legal rights of these parties is erroneous, I have at least put the case in a shape convenient for review.

To give effect to the views of the court, you should find a ver⁻ ⁻dict for the plaintiff, and that the New Jersey West Line Rail⁻ road Company took title and a right of possession to the lands ⁻described in its grant, except for that part in West Central ave⁻ nue which was between the lines of high and low water, the ⁻description of which is set out in Exhibit No. 91.

*Mr. J. W. Taylor* and *Mr. James E. Gowen,* of Pennsylvania, ⁻:for complainants.

*Mr. R. Gilchrist* and *Mr. T. N. McCarter,* for the receiver of ⁻the West Line R. R. Co.

THE CHANCELLOR.

The grounds on which the complainants' claim to relief is based are so fully stated in the opinion of the court of errors and appeals in this case (*8 Stew. Eq. 181*), and in the charge of the justice who presided at the trial of the issue at law, that it would be entirely superfluous to restate them here at any length. The land in question in this suit is a tract known as the West Line Grant, formerly wholly under the waters of Communipaw bay. The complainants claim it as riparian owners, and insist that their title as such was recognized, fortified and established by the wharf act of 1851. They also claim title acquired by them, as they allege, under the act of 1860, authorizing the extension of the Central railroad, and under the act of incorporation of the American Dock and Improvement Company, passed in 1860. They also claim title by estoppel. The opposing title, that under which the property is claimed in behalf of or under the West Line Railroad Company, rests wholly upon a special grant from the state contained in the ninth section of the supplement to the charter of the West Line company (which supplement was passed in 1872), and in a deed made, as is claimed, under and in execution of the authority of that section. The question presented by the issue at law was whether the West Line Railroad Company, at and after the delivery of the deed from the state to it, had the legal title to and right of possession of all or any part of the land described in the deed; and if it had such title and right to part only, to what part it was so entitled. As to such facts as the judge at the trial held to be material, there was no dispute, and consequently, under his rulings as to the admissibility of evidence offered on the trial, there was no question of fact to be settled by the jury. He so charged accordingly. Under the charge they found a verdict in favor of the complainants, who were defendants in the issue, for a small part (two hundred and fifty-seven thousandths of an acre) of the land, and in favor of the receiver of the West Line company, who was the plaintiff in the issue, for the rest.

The complainants now move to set aside the verdict on several grounds, which will be stated in connection with the con-

sideration thereof. On the other hand, their adversaries not only resist the motion, but move, on notice, for a decree upon and in conformity with the verdict.

The first ground assigned for a new trial is that the judge erred in permitting the plaintiff in the issue to give in evidence the deed from the state to the West Line company without requiring proof that the lands described therein came within the location made by the company, and that the price of the land had been paid before the grant was made.

The authority for the grant is, as before stated, contained in the ninth section of the supplement of 1872 to the charter of the West Line company. That section provided that any lands of the state under tide water, or that might theretofore have been under tide water, which should happen to come within the location of the route or of the depots, stations or other works of the company or should be needed therefor, should be paid for by the company to the trustees of the school fund of the state ; that the boundaries and price thereof should be fixed by the riparian commissioners, on application for that purpose to them ; that the price should be paid prior to any filling or improvement thereon authorized by that section ; that on such payment the title to the land should vest in the company in fee simple, and that a deed therefor might be made by the riparian commissioners, governor and attorney-general, in the name and under the great seal of the state. The deed recites that the land thereby conveyed lies, in part, under tide water, and part theretofore lay under tide water ; that it happened to come within the location of the route, of the depots, stations and other works of the company, and was needed therefor ; that the commissioners, pursuant to the above-quoted section, and on application of the company, had fixed the boundaries as they were thereinafter described, and the price of the lands at $125,000, and that the company had, pursuant to the directions of the act, paid that sum to the trustees of the school fund of the state ; and it declared that the conveyance was made in consideration of those premises and of that sum of $125,000 paid to the trustees of the school fund, the receipt whereof was thereby acknowledged and the company for-

ever released and discharged therefrom. It will be seen that the instrument declares that all the prerequisites to the grant have been complied with. The deed (which was under the great seal of the state) was of itself competent evidence, without proof, that the previous steps leading to the vesting of the title had been taken. *Brown* v. *Galloway, Pet. C. C. 291.*

The second ground is, that the judge refused to allow the defendants to offer evidence to show that the land conveyed by the deed did not come within the location of the road or of the depots, stations, or other works of the company. It may be remarked, in passing, that the land was granted by the act not merely in the contingency that it should happen to come within the location of the route, depots, stations or other works, but also in case it should be needed for any of those purposes. The act was of itself a grant of the land. It declared that the title to the land should, on certain conditions, vest in the company in fee. It provided also for the ascertainment of the boundaries and the fixing of the price, and to whom the price was to be paid, and also for the giving of a deed by the governor, attorney-general, and riparian commissioners, in the name and under the great seal of the state, for the property. The act was offered and received in evidence on the part of the plaintiff in the beginning of the trial. The defendants' counsel urge that evidence that the land was not within the location should have been admitted with a view to defeating the grant—to show want of authority to make the deed. But the evidence was not competent. In *Polk's Lessees* v. *Wendell, 9 Cranch 87 (1815)*, Chief-Justice Marshall, speaking in reference to a patent for land, says that every prerequisite has been performed is an inference properly deducible, and which every man has a right to draw, from the existence of the grant itself, and that it would therefore be extremely unreasonable to avoid a grant in any court for irregularities in the conduct of those who are appointed by the government to supervise the progressive course of a title from its commencement to its consummation in a patent. He adds that there are some things so essential to the validity of the contract that the great principles of justice and of law would be violated,

did there not exist some tribunal to which an injured party might appeal, and in which the means by which the elder title was acquired might be examined; that in general a court of equity appears to be a tribunal better adapted to that object than a court of law; that on an ejectment the pleadings give no notice of latent defects of which the party means to avail himself, and should he be allowed to use them the holder of the elder grant might often be surprised; but that in equity, the specific points must be brought into view &c. He further says that, in general, equity is the more eligible tribunal for those questions, and that they ought to be excluded from a court of law. He adds that there are cases in which a grant is absolutely void, as where the state has no title to the thing granted, or where the officer has no authority to issue the grant; and that, in such cases, the validity of the title may be inquired into at law. The same doctrine is laid down in the recent cases of *Smelting Co.* v. *Kemp (1881), 104 U. S. 636,* and *Steel* v. *Smelting Co. (1882), 106 U. S. 447.* In the former case, the court says that the doctrine goes so far that if, in any circumstances under existing law, a patent would be held valid, it will be presumed that such circumstances exist. The court also says that a patent may be impeached collaterally in an action, and its operation, as a conveyance, defeated, by showing that the defendant had no jurisdiction to dispose of the lands; that the law did not provide for selling them, or that they had been reserved from sale or dedicated to special purposes, or had been previously disposed of to others. The court adds that in establishing any of those particulars, the judgment of the department is not assailed, nor is the regularity of the proceedings called into question, but the authority of the department to act at all is denied, and shown to have never existed. In the case in hand the act of the legislature was, as before stated, in itself a grant of the land in a certain contingency, and on a certain condition. There was authority to convey, provided the contingency existed, and the condition was performed. The former was that the land happened to come within the location of the company's road or works, or was needed therefor, and the condition was payment of the price, which was to be

fixed (as were the boundaries) by the riparian commissioners. Whether the contingency had happened or not, and the extent to which, if it had happened, the land of the state was to be taken under the authority given by the act, and what price was to be paid, were matters left, in the first instance, to the judgment of the commissioners, and were then to be adjudicated upon by those who were to give the deed—the governor, the attorney-general and the commissioners. The act, in other words, granted the land on payment of the price, leaving it to those who were to give the deed to determine whether the land was in the location of the route or works, or needed therefor, and what the boundaries should be declared to be, and what price should be paid, and whether it had been paid. In *Minter* v. *Crommelin, 18 How. 87*, it was held, in a case where title to an Indian reservation, which was to be forfeited by abandonment, was claimed by patent, that it was to be presumed that the secretary of the treasury had decided the fact of abandonment, and issued the order for sale. In this case the question as to whether the land had been disposed of by the state previously to the making of the grant, so that it had no title when the grant was made, was tried in the suit so far as it could be tried in a court of law, which, in an ejectment, can deal with legal titles alone. There was no error in the exclusion, on the trial of the issue, of the evidence offered to show that the land was not within the location.

The third ground of alleged error is, the refusal to permit the defendants to prove the amount of expenditures incurred in carrying out the entire system of improvements in Communipaw bay according to the original plan adopted by them. The court permitted them to prove their expenditures upon the land in question; but they claim that they ought to have been permitted to show expenditures by them elsewhere, also in or towards the execution of a plan or project adopted by them for the reclamation and improvement of a large tract formerly wholly under tide water, to which they claim title, and of which the West Line grant is part. As a legal proposition, it is clear that reclamation of land under water in one place, would not give a

legal title to land under water elsewhere. The judge, therefore, properly refused to permit the defendants to prove such expenditure.

The fourth ground is, that the judge refused to permit the defendants to prove that from 1863 to 1872, the Central Railroad Company had reported annually, as part of the cost of its road, the cost of its work of reclamation and improvement in Communipaw cove, and had annually paid to the state a tax of one-half of one per cent. upon such cost so reported. The section of the supplement to the charter of the company pursuant to which the reports were made, and the tax paid, provides that the company shall annually report the cost of its road, and shall pay to the state a tax of one-half of one per cent. thereupon, and provides that no other tax or impost shall be levied or assessed upon the company. To include in the report of the cost of the road expenditures for reclamation and improvement of the great tract of land in Communipaw cove, without mentioning those expenditures, would obviously be no notice to the state that such expenditures had been made. Such expenditure was not in fact part of the cost of the road. If the expenditures had been distinctly and explicitly reported as expenditures for the reclamation and improvement of the land under water, the fact that the state had received the tax upon them under such circumstances would not have created a legal title to the land on which the expenditures had been made. The objection under consideration is therefore untenable. ·

The fifth objection is, that the judge erred in his charge in certain matters to which exceptions were taken which will now be considered. The first is the charge that the thirteenth section of the riparian act of 1869 was designed for the benefit of the riparian owner, who, after notice, had neglected to apply for the grant, and the grant had consequently been made to some one else. Also, that the right of the riparian owner to compensation in such case was by the act made to depend upon whether, in law, he had such a right or interest as would make compensation to him necessary in order to enable the state to make the grant. The eighth and thirteenth sections contemplate the making of

a grant of the shore to some one else than the riparian owners; but out of regard to a natural and obvious equity, the eighth section gives such owner preference, as a purchaser, over any stranger, and the thirteenth provides for the protection of any right he may have in case the grant is made to a stranger. The eighth provides that no grant shall be made to a stranger unless the riparian owner, after six months' notice, shall have neglected to apply for a grant to himself, and pay, or secure to be paid, the price which the commission shall have fixed. The thirteenth provides that where the grant is made to a stranger, he shall not fill up or improve the lands granted until the rights and interest of the riparian owner in them (if any he has) shall be extinguished by compensation as provided for in that section. The title of the state to what is known as the shore is beyond all controversy. The provision for notice to the riparian owner before sale to a stranger, was not the result of a necessity, but was a gratuitous concession on the part of the state, which it had the power to withdraw at will. It was of grace and not of right. The provision for compensation to such owner was not a recognition of any absolute right or in'erest on his part as such, for it is guarded by a qualification which forbids such a conclusion. Provision is made for compensation only in case the riparian owner has any rights or interest in the land granted. If it had been intended to be a recognition of the existence of the right of such owner to or in the land granted, the provision for compensation would have been unqualified, and the recognition clear and absolute. The legislature had the power to rescind the provision for pre-emption, and in the case in hand it did so by the special grant in the supplement of 1872 to the West Line charter. It had also the power to repeal the provision for compensation. The wharf act (of 1851) conferred only a license revocable at the will of the legislature at any time before improvement actually made. The riparian act of 1869 repealed the wharf act, so far as lands under the tide water of the Hudson river, New York bay and Kill von Kull were concerned, saving, however, any grant of land under water or right to reclaim, made directly by legislative act, or grant or license, power or authority

so made or given, to purchase, fill up, occupy, possess and enjoy lands covered with water, fronting and adjoining lands owned, or authorized to be owned, by the corporation or grantee or licensee in such legislative act mentioned, its, his or their representatives, grantee or assigns; saving, also, any grant or license, power or authority to erect or build docks, wharves and piers opposite and adjoining land owned, or authorized to be owned, by the corporation or grantee or licensee in the legislative act mentioned, its, his or their representatives, grantees or assigns theretofore made or given directly by legislative act, whether those acts were repealable or not; and saving, also, and making irrevocable, any revocable license given by the board of chosen freeholders of a county to build docks, wharves or piers, or to fill in or reclaim any lands under water in the New York bay, Hudson river, or Kill von Kull, so far as the land under water had been reclaimed or built upon under such revocable license; and it expressly provided that as to the future, such revocable license was thereby revoked, and that no occupation or reclamation of land under water without such legislative act or revocable license, should divert the title of the state or confer any rights upon the party who had reclaimed or who was in possession thereof. Any riparian owner who had reclaimed the shore in front of his land before the passage of that act, had legal title to the land reclaimed. After the passage of that act, reclamation in the places to which the act was applicable by a riparian owner having no special legislative authority, without the permission of the commissioners, conferred no legal title. As to the land under water in those places, the state, of course, if it still held legal title, had the power to make a special grant. The right or interest of the riparian owner, referred to in the thirteenth section of the riparian act, was the claim of adjacency, the right to reach tide water from his land. But that right was subsequently, in 1870, held not to interfere with the right of the state to sell the shore to a stranger. In *Stevens* v. *Paterson and Newark R. R. Co., 5 Vr. 532,* it was held, in the court of errors and appeals, that the state could grant land in navigable water within its territorial limits, to any one without making com-

pensation to the riparian owner. Since that decision it is clear that, at law, the riparian owner who has not in fact reclaimed the land under water in front of his bank has, as riparian owner, no legal right to, or in respect to that land, which will prevent the state from granting it to any person, and that without any compensation to such owner.

The second ground of exception is as to that part of the charge which was an expression by the judge of an opinion derived from the consideration of the provisions of the West Line supplement, that the legislature, in the ninth section, contemplated the taking by the railroad company of the very land in dispute. That was a matter in no way material. It had no important bearing in the case. But the reasons presented by the judge for his opinion are persuasive, and tend, at least, to lead to the conclusion which he reached.

The third exception is to the charge that the grant to the West Line company was not in violation of the constitutional prerogative of congress to regulate commerce with foreign nations and among the several states. The judge said that ever since the decision in *Willson* v. *Blackbird Creek Co., 2 Pet. 245,* it has been regarded as settled that the power of congress does not exclude the jurisdiction of the state over navigable waters within its boundaries, and that a state law on this subject is not invalid unless congress has acted and the state law is in conflict with the congressional regulations, or interferes with the rights which are permitted by them. He added that he did not consider certain acts of congress, making appropriations for the improvement of New York harbor, as congressional legislation of such a character as would conflict with the right of the state to make the grant. By the convention between this state and the state of New York (*Nix. Dig. p. 822*), it was agreed that this state should have the exclusive right of property in and to the land under water lying west of the middle of the bay of New York and west of the middle of that part of Hudson river which lies between Manhattan island and New Jersey; and that this state should have exclusive jurisdiction of and over the wharves,

docks and improvements made and to be made on the shore of this state &c. That compact was approved in all its parts by congress, in 1834 ; the act of approval, however, containing a provision saving the jurisdiction of the United States in and over the islands or waters. The views expressed by the judge upon the matter under consideration, were a correct statement of the law on the subject. There is another consideration of such conclusive force as to deprive the objection of all weight. The complainants themselves claim the land in question, under title derived from the state, by grant express or implied, or by estoppel. Yet, though claiming under the state, they insist that the state never had any right to make a grant. The question in this suit is between rival claimants, who, on both sides, claim under the state, and in this controversy—as between them—the question whether congress has jurisdiction or not is neither material nor pertinent.

The fourth exception is to the charge, that it was unnecessary for the plaintiff in this issue to show that the conditions on which the grant of land in controversy was authorized, had been complied with, and that evidence to the contrary on the part of the defendants in the issue was inadmissible. This subject was dealt with and disposed of in the former part of this opinion, in the consideration of the first and second grounds.

The fifth and sixth exceptions are to the charge that the grant did not become inoperative by reason of the forfeiture of the charter of the West Line company.

The point of these objections is that inasmuch as by the charter of the West Line company it was provided that if the railroad should not be completed at the expiration of ten years from the 1st day of July, 1865, then and in that case (except as to the part constructed), the act should be void; and inasmuch as the period expired in 1875, and that part of the road which was located on the land in question was not then built; and inasmuch as the company has been declared insolvent and its franchises sold, and the grant was intended merely for the purposes

of the company, for the exercise of its franchises, the grant is, in view of these considerations, void.

The grant, though made to a railroad company and for its purposes, was in fee and for a consideration paid. If, under the circumstances, the land reverted to the state, it alone could take advantage thereof. The defendants could not do so. It cannot be doubted that if, instead of ceasing to exercise its franchises, the company had changed its route, land acquired by it in fee, for a consideration, for its original route, would have been held to be still its property in fee. A railroad company may buy land in fee and hold it, and, if it becomes insolvent, such property will be assets for the payment of its debts.

The remaining exceptions are to that part of the charge which relates to the construction of that part of the charter of the American Dock and Improvement Company which granted power to that company to purchase and hold any lands "adjoining or near" the tracts of land mentioned in the act as being then owned by the corporators, and to improve all and every portion of the lands under water held or purchased by it "as therein aforesaid," and granting it liberty to fill up, raise, occupy, possess and enjoy, as its own property, all lands covered with water which it might hold or purchase, or which might lie in front of any lands which it might hold or purchase &c.

The principle applied by the judge in construing these provisions was, that grants of this description are to be construed strictly against the grantees, and that the state is never presumed to have parted with any of its property in the absence of conclusive proof, either in express terms or by necessary implication, of its intention to do so.

The charge on the subject under consideration was correct. It was, in brief, that the grant of power to purchase under the charter will be satisfied by confining it to the lands between the limits fixed in the eleventh section, i. e., between Cavan Point and the south line of the lands of the Central Railroad Company.

The remaining reasons are, that the verdict was the finding of the jury by direction of the judge (wherefore, it is insisted, the

issue was not, in fact, tried by a jury), and that the verdict was contrary to the evidence.

As before stated, there were no disputed facts. No fact that the judge permitted the parties to introduce was questioned. There was, therefore, no occasion for any deliberation by the jury as to those matters. There remained only questions of law, as to which it was the duty of the judge to instruct and direct them. He neither erred in his rulings upon the admissibility of the evidence offered, nor in his view of the law of the case. The verdict, therefore, is satisfactory to me as the finding of the state of the legal title to the premises in question. It will, therefore, be permitted to stand accordingly.

The defendants move for a decree upon the verdict. If the finding of the legal title were conclusive of the controversy, they would be entitled to such decree. But there still remains at least one matter of much importance to be determined, viz., whether the legal title must not give way to and follow the equitable one claimed by the complainants.

The question whether, since the decision in *Stevens* v. *Paterson and Newark R. R. Co.*, the riparian owner has a right of adjacency of which he may avail himself in equity as against a grant to a stranger, is yet to be considered. There may also be considerations in regard to the West Line grant, and its validity as against the complainants, which, though inadmissible in the trial of the issue at law, may have great weight here.

It was said by Chief-Justice Marshall, in *Polk's Lessees* v. *Wendell, 9 Cranch 87*, that while at law only certain defences may be set up to avoid a patent, in equity the defects in the title under such an instrument are the particular objects of investigation, and that that court may, on a view of the whole case, annex equitable conditions to its decree, or order what may be reasonable, without absolutely avoiding the whole grant. The bill in this case, in addition to the claim of legal title, sets up one purely equitable, based upon equitable estoppel arising from the acquiescence of the state in the expenditure by the complainants of very large sums of money in reclaiming and improving the property. In that connection, the question whether improvements in

29

partial execution of a plan or project for reclaiming a tract of which the land in controversy formed part, although such improvements were not made upon that land, are to be considered in equity as if made there, would properly come up for consideration.

The bill expressly claims the benefit of the equity which arises where an owner of property has permitted another person to expend money upon it in improvements which have added to its value. It alleges that acting under their construction of their charters, the complainants have, with the knowledge and acquiescence of the state, expended very large sums in improving the land, and they therefore claim that in view of that fact, they ought, irrespective of their claims under their charters, to be held in equity to be the owners of the land. The principle upon the application of which they rely, has long been established. In *Pilling* v. *Armitage, 12 Ves. 78*, Sir William Grant, M. R., says : " There are different positions in the books with regard to the sort of equity arising from laying out money upon another's estate through inadvertence or mistake ; that person seeing that, and not interfering to put the party upon his guard. The case with reference to which that proposition is ordinarily stated, is that of building upon another man's ground. That is a case which supposes a total absence of title on the one side ; implying, therefore, that the act must be done of necessity, under the influence of mistake, and undoubtedly it may be expected that the party should advertise the other that he is acting under a mistake."

One reason for the principle is, that it is inequitable under the circumstances that one man should be profited at the expense of another. *Nemo debet locupletari ex alterius incommodo.* The doctrine is considered with favor, and the grounds of it stated by Judge Story in *Bright* v. *Boyd, 1 Story C. C. 478*. A notable instance of its application is to be found in *McKelway* v. *Armour, 2 Stock. 115*, where one upon whose land another had, by his own mistake alone (supposing the land to be his own property), built a house, was compelled to accept the alternative of conveying the land to the latter for due consideration, or paying for the

improvements. In the case under consideration, the legal title to the land when the improvements were made was in the state, and, according to the bill, the reclamation was made by the riparian owners, not only under the supposed authority of their charter, but under a claim of the right of adjacency. It is urged by the defendants that the title of the state could not be defeated or affected by those considerations because, as alleged, the reclamation was made after prohibitory notification on the part of the state. But there is no evidence before me on that head. The evidence taken on the trial of the issue at law is not before me for any purpose, except collaterally for the purpose of determining what weight is to be given to the verdict, and it is not evidence on the final hearing, there being no order that it stand as evidence in the cause. *Prudden* v. *Lindsley, 2 Stew. Eq. 615.*

Again it is argued that if such considerations could avail to defeat or affect the title of the state, they could not affect the title of the West Line company because, as alleged, they had no notice of the equity. There being no evidence whatever in the cause which can be used on the final hearing, it is impossible to adjudicate upon that subject at this time.

Both motions (for a new trial on the one side, and for a final decree upon the verdict on the other) will be denied, with costs