New Jersey Zinc and Iron Co. *v.* Morris Canal and Banking Co.

---

## THE NEW JERSEY ZINC AND IRON COMPANY

### *v.*

## THE MORRIS CANAL AND BANKING COMPANY and another.

1. A license under the Wharf act of 1851 confers no right on the licensee, unless he is the owner of upland abutting on tide-water. His license is conditional, dependent on his having title to a *ripa* lying behind the public domain covered by his license.

2. A person acquiring land abutting on a navigable stream takes title only to the high-water line, and that line is limited by the outflow of the medium high tide between the spring and neap tides. All below that line belongs to the State. But, in virtue of a local custom, now having the force of established law, the adjacency of the land of such an owner to the stream, invests him with a license to fill in and dock out on the public domain in front of his land, to such an extent as does not interfere with public rights, and this license, when executed, becomes irrevocable.

3. Under a deed granting only a qualified fee, the grantee has, while his estate continues, the same right to the exclusive possession and enjoyment of the land granted, and as complete dominion over it, for all purposes, as though he held it in fee simple absolute.

4. Where the State invests a corporation with the prerogative of eminent domain, for the purpose of enabling them to construct and operate a public

New Jersey Zinc and Iron Co. *v.* Morris Canal and Banking Co.

highway, and they take land, by force of their charter, for the purposes of such highway, the grant to them should be construed, not as investing them with capacity to take a fee, but as merely giving them power to acquire such an easement in the land taken as will enable them fully to accomplish the purposes for which they were created.

5. Such grants, like all public grants, are to be strictly construed. What is not plainly given is to be understood as withheld.

6. In cases where the Morris Canal and Banking Company have, by force of their charter, and not by grant, taken land for a part of their right of way, there they have simply acquired such an easement in the land·as it was necessary for them to have to fully accomplish the purposes of their creation, leaving the fee in the owner of the land, with good right on his part to make any use of the land which will not prevent the canal company from having the full enjoyment of their easement.

7. The acquisition by a railroad or canal company of an easement for a right of way over the land of a riparian owner, along or on the shore of his land, does not, according to general principles of law, deprive such owner of his right or equity to preserve or improve the connection of his land with the adjacent tide-water.

On final hearing on bill and answer and proofs.

*Mr. John R. Emery* and *Mr. Henry C. Pitney,* for complainants.

*Mr. Oscar Keen* and *Mr. Robert Gilchrist,* for defendants.

VAN FLEET, V. C.

This suit is brought under the statute of 1870, authorizing this court in certain cases to settle and determine the title to lands. *Rev. p. 1189.* The jurisdiction of the court is undisputed. Both parties admit that the necessary facts to give jurisdiction exist, and each calls upon the court to pronounce a decree establishing the title it sets up. The case presents simply a question of title.

The subject of the suit is a tract of land, situate in the city of Newark, lying on the south side of the Passaic river, extending northerly from the tow-path of the Morris canal to the dock line of the river, and bounded on the east by lands of a corporation known as the Chemical Works, and on the west by lands of

S. C. Williams. Its dimensions, as given in the complainants' bill, are as follows : Being one thousand and ninety-five feet in length along the dock line, about eleven hundred and seventy feet in length along the tow-path, about one hundred and seventy-eight feet along lands of the Chemical Works, and about one hundred and two feet along lands of S. C. Williams. From this description, it will be seen, that the principal part of the land in controversy lies between the high and low-water lines of the Passaic river. The complainants' immediate predecessors in title —the New Jersey Zinc Company—in October, 1870, obtained a license, under the Wharf act of 1851, from a joint commission appointed by the chosen freeholders of the counties of Essex and Hudson, authorizing them to fill in and dock out on the land in question, and they, soon thereafter, erected a line of piling, surmounted by a cap or string piece, along its front and western boundary. The land on the east, belonging to the Chemical Works, and forming the eastern boundary of the tract in dispute, had already been filled in out to the dock line. The complainants and their predecessors in title, after obtaining the license, and before the institution of this suit, expended in improving the land in dispute over $17,000.

The license granted to the New Jersey Zinc Company gave them no authority to fill in and dock out, unless they were the owners of a *ripa*, lying behind the land covered by tide-water. A license, granted under the statute of 1851, confers no right whatever on the licensee, unless he is the owner of the shore, and is of no use to him unless he is. His license is conditional, the condition being that he has title to a *ripa* lying behind the public domain covered by his license. *Brown* v. *Morris Canal Co.,* *3 Dutch. 648.*

Without title to a *ripa*, it is entirely clear, that the complainants are in no position to assert a right to any of the land in dispute lying beyond the high-water line. The law on this subject is so firmly settled as not to be open to debate in this court. All navigable waters within this State, together with the soil under them, belong, in actual proprietorship, to the State. A person acquiring title to land abutting on a navigable stream,

takes title only to the high-water line, and that line is limited by the outflow of the medium high tide between the spring and neap tides. All below that line belongs to the State, and the State may, at any time before it is reclaimed by the owner of the adjacent upland, grant it, for a public use, to whomsoever it sees fit. A grantee of lands abutting on a navigable stream, acquires no peculiar rights, as incidents of his estate, in the land beyond the high-water line lying in front of his land, but in virtue of a local custom, long prevalent in this State, and now having the force of established law, the adjacency of his land to the stream invests him with a license to fill in and wharf out, on the public domain, to such an extent as does not interfere with the public rights of fishing and navigation, and this license, when executed, becomes irrevocable, and confers on the riparian owner a good and indefeasible title to the land thus reclaimed. *Gough* v. *Bell, 2 Zab. 441; Stevens* v. *Paterson and Newark R. R. Co., 5 Vr. 532.* No such license exists, however, in favor of any person, except a riparian owner. It is a right growing out of the adjacency of his land to navigable water, and is incident to the ownership of land thus located, but can have no existence apart from the ownership of land abutting on a navigable stream.

The complainants show a perfect paper title to the lands in dispute. They claim under the Proprietors of the Eastern Division of New Jersey. Their title to the eastern part of the tract in question, originated in a survey made to one of the Proprietors in March, 1806, and to the western part under a survey made to another of the Proprietors in August, 1833. The transmission of the title from these two Proprietors to the complainants, through several intermediate conveyances, is fully established. The defendants do not deny that the complainants show a perfect paper title, but they say that all the lands covered by their title lay, at the time their title originated, below the high-water line of the Passaic, and therefore it was not possible for a title to be acquired to them, except by a grant from the State, and that, inasmuch as no such grant is shown, the complainants show no title; in other words, that their paper title is worthless. This statement of the defence is, in a material respect, much

26

broader than that made by the defendants' answer. It is a fact about which there is no dispute—indeed, it is one of the few things about which no controversy was made during the hearing —that the defendants' canal, along nearly the whole of the *locus in quo*, was constructed in part on lands covered by the complainants' title. The defendants' answer does not claim, that that part of the land covered by the complainants' title, upon which the defendants constructed their canal, lay below the high-water line of the Passaic. On the contrary, it distinctly admits, that it lay above the high-water line. The answer speaks, on this point, as follows: that the canal was so located, along and opposite the piece of land in dispute, as that it skirted the high-water line of the Passaic, in such manner that when it was constructed the base of the bank, which supported the tow-path of the canal, extended to the high-water mark of the river along the whole length of the strip of land now in dispute in this cause. This averment, as I understand it, asserts, with the utmost perspicuity, that, on the completion of the canal, the base or foot of the tow-path was coincident with the high-water line along the whole of the *locus in quo*. It follows, necessarily, that all of the land covered by the complainants' title, which the canal and tow-path occupied, lay above high-water line.

Accepting the statement of the answer on this subject as an accurate description of the location of that part of the land covered by the complainants' title, which the canal occupied, there can be no doubt that their title, at one time, embraced a sufficient *ripa* to confer upon the person who held it all of the privileges which inhere in the ownership of land abutting on a navigable stream. Under such a condition of facts, the important question which the court would be called upon to decide, would be, whether the defendants, by the acquisition of an easement, for the purposes of their canal, over the *ripa* covered by the complainants' title, that is, by simply taking possession of such *ripa* and building their canal on it, and retaining possession of it for over forty years (for the defendants have shown no better or other title), had so far succeeded to the privileges, which the owner of the *ripa* might otherwise have exercised over the shore

lying in front of his land, as to put it in their power to prevent him from exercising them.   I believe no court in this State has as yet decided that, where the Morris Canal and Banking Company have, either by condemnation or by taking possession, acquired land abutting on tide-water, simply for a part of their right of way, and not as a terminus, the right thus acquired gave them authority to exercise the privileges of a riparian owner.   On the contrary, the truth is, that serious doubts have always been expressed, whenever the question has received attention, whether, in view of the provisions of their charter, the defendants were competent to exercise the privileges of a riparian owner, even over the shore of land which they hold by grant from the owner of the fee.   The utmost extent to which the decisions on this question have as yet gone, is this: that the canal company were competent to receive such privileges, by grant, from the owner of the fee, and thus cut him off from the right to exercise them, but it was doubtful whether they themselves could exercise them, or take them for any other purpose than to prevent their grantor from exercising them.   This is the view expressed by the supreme court in *State* v. *Brown, 3 Dutch. 13,* and although the judgment pronounced in that case was subsequently reversed (*Brown* v. *Morris Canal Co., 3 Dutch. 648*), yet the judgment of the supreme court, as to the effect which should be given to a grant made by a riparian owner to the canal company, has since been twice approved by the court of errors and appeals.   *Hoboken Land and Improvement Co.* v. *Hoboken, 7 Vr. 540; Fitzgerald* v. *Faunce, 17 Vr. 536.*

The difference in the legal effect which must be attributed to the conveyance of an estate in fee, whether absolute or qualified, and the right which the defendants acquired by simply taking possession of land for a right of way, or condemning it for a like purpose, is wide and vital.   Under a conveyance, even if it be of only a qualified fee, the defendants have, while their estate continues, by the plain terms of their grant, an absolute right to the exclusive possession of the land conveyed, and any attempt by their grantor to exercise any sort of possession over the land, or to use any part of it as a means of advantage or profit to

himself, would be in plain derogation of his grant, and a clear violation of the defendants' rights. The defendants, under a deed conveying only a qualified fee, would, while their title continued, have the same right to the exclusive use and enjoyment of the land, and as complete dominion over it, for all purposes, as though they held it in fee simple absolute, and no one, I suppose, would pretend that it would be possible for a grantor, after making a title of that description, to set up, with the least show of success, a right or interest of any kind in the land conveyed. But the defendants' right in lands, acquired by any other means than by grant, stands on an entirely different foundation. Where the State invests a corporation with the sovereign prerogative of eminent domain, for the purpose of enabling them to construct and operate a public highway, and they take land by force of their charter, or by any other means than by grant, for the purposes of such highway, it is manifest, that the plain purpose of the grant to them is not to give them capacity or invest them with power to take a fee, but merely to give them power to acquire such an easement in the land as will enable them fully to accomplish the purposes for which they were created. The plain design of the grant, in such a case, is to enable them to acquire what they require for the construction and successful operation of their highway, but nothing more. The title to the land taken remains, in such cases, in the owner, subject only to such servitude as the corporation has power to impose, and their power in this respect is limited, as a general rule, to such use of the land as may be reasonably necessary for a right of way. *Taylor* v. *New York & Long Branch R. R. Co.*, 9 *Vr.* 28; 1 *Redf.* on *Railways* 270. Such grants, like all public grants, are to be strictly construed. The grantee takes nothing except what is plainly given either in express terms, or by necessary and unavoidable implication. What is not plainly given is to be understood as withheld. Any ambiguity in the terms of his grant will be fatal to his claim. To doubt in such a case is to deny.

The canal at the place in dispute was not constructed under the original charter granted to the defendants on the 31st of December, 1824, but under a supplement passed January 26th,

1828.  By their original charter, the defendants were empow-
ered, after locating the route of their canal, and without first
making compensation, to enter upon, take possession of, and use
all such lands, waters and streams as were necessary for the pur-
poses of their canal.  They were authorized to take private
property, for the use of their canal, without first making com-
pensation.  Entry by them upon the lands of another, and
appropriating the land to their own use, for the purposes of their
canal, neither constituted a trespass, nor gave the owner a right
to maintain an action of ejectment against them.  *Kough* v. *Dar-
cey, 6 Hal. 237 ; Den* v. *Morris Canal Co., 4 Zab. 587 ; Lehigh
Valley R. R. Co.* v. *McFarlan, 4 Stew. Eq. 706 ; S. C., 14 Vr.
605.*

By the supplement of January 26th, 1828, the defendants
were authorized to extend their canal from the Passaic river
to the waters of the Hudson, but in making the extension they
were not authorized to take any land until they first paid for
it, or tendered its appraised value to its owner.  Under their
original charter, their power to take land was subject to a very
important limitation, and this limitation applied with equal force
to all lands, taken for the extension, which were acquired by force
of their charter, and not by grant.  By the twenty-seventh sec-
tion, it is declared that the defendants' power to take land shall
be so construed as that they shall not be authorized to take or
appropriate to the use of their canal, or under color or pretence
that the same are necessary therefor, any lands, waters, or
streams of water, but such only as are actually necessary for the
erection and use of their canal for the purposes of navigation
only, and its necessary towing paths and works.  This language,
in my judgment, will bear but one interpretation, and that is,
that, when the defendants, by force of the power conferred upon
them by their charter, and not by grant, or with the consent of the
owner, acquired land for a part of the right of way of the public
highway which they were authorized to construct and operate,
that they simply took such an easement, or right in the land,
as it was reasonably necessary for them to have, in order that
they might build their canal, and afterwards use and operate it

as a public highway.   Or, to state what they took, as contrasted
with what the land-owner retained, it may be said, that the owner
of the land was required to yield to the defendants such posses-
sion, use and enjoyment of the land taken as it was necessary
for them to have to enable them to fully accomplish the pur-
poses of their creation, but nothing more.   He retained the fee,
and also all privileges and incidents belonging to it, together
with the right to make any use of the land which would not
injuriously interfere with the defendants in the full and free use
of their easement.

    The word "lands" was used in this part of the charter, as I
think, as the equivalent of right or estate, so that if the legisla-
tive purpose had been expressed with entire aptness, this clause
would have read in this wise : that that part of the defendants'
charter giving them power to take land, shall be so construed as
that they shall not be authorized to take any right or estate in
lands taken by them for the purposes of their canal, but such
only as shall be actually necessary for the erection and use of
their canal, for the purposes of navigation only, and its necessary
towing paths and works.   That this is the construction which
this clause of the charter should receive, is made manifest, as I
think, by a subsequent clause of the same section, which declares,
that the defendants shall not be authorized to demise, grant,
alien or sell any such lands, waters or streams, taken, or pre-
tended to be taken, or required, for the use of their canal, to any
person or persons whomsoever, except only such land as may be
received by them by donation, or acquired by them by private
contract.   These two clauses, when considered together, seem to
me to leave the purpose of the legislature, in two respects,
entirely free from doubt: *first,* that what the defendants should
have the right to acquire, should only be such in quantity,
quality and duration as it should be reasonably necessary for
them to have to fully accomplish the objects for which they were
created ; and *second,* that what they acquired should be inalien-
able, and that they should derive no benefi from it, except such
as might be obtained by using it for the purposes for which they
were authorized to take it.   The words of limitation employed

in both clauses demonstrate, I think, with great clearness, that it was an important part of the legislative scheme, in granting this charter, to rigidly restrict the right which the defendants might acquire, where they took land merely for a right of way, and by any other means than by grant, to such an easement as it should be necessary for them to have to fully accomplish the purposes of their creation, leaving the fee of the land in its owner, with good right and full power on his part to make any use of the land which would not deprive the defendants of the full beneficial enjoyment of their easement.

This construction puts the defendants' charter in complete harmony with what has always been considered a wise and just public policy on this subject in this State. In 1866, Chief-Justice Beasley, in pronouncing the opinion of the court of errors and appeals in *Keyport Steamboat Co.* v. *Farmers Transportation Co.*, *3 C. E. Gr. 511*, said : " Public sentiment, from the earliest times to this day, and the whole course of legislative action in this State, have recognized a natural equity, so to speak, in the riparian owner to preserve and improve the connection of his property with the navigable water, and the consequence is, that a strong presumption arises against an implication of an intention on the part of the legislature to violate such equity. In my opinion, such a design should not be deduced from the words of any statute, either general or special, except when it contains language not susceptible of any other rational interpretation." In 1877 a statute was passed, which declares that, when land has been or shall be taken or granted for a right of way, and such right of way has been or shall be so located on the land of a riparian owner as to occupy the same along or on the shore line, and thereby separate the upland of such riparian owner, adjoining that used for such right of way, from tide-water, such owner of the land so subject to such right of way shall be held to be the riparian owner for the purposes of receiving any grant or lease heretofore or hereafter made of lands of the State under water, or for the purpose of receiving any notice under the act to which this is a supplement, or the supplements thereto. *Rev. p. 987 § 29.* So far as this statute was intended to be retrospective,

it is unquestionably valid as against a person who, at the time of its passage, held merely an unexecuted license to fill in and dock out, for, until such license has been executed, it is competent for the legislature to adopt any regulation, respecting land lying below the high-water line, which to it may seem wise and just. This statute embraces, it will be observed, both lands taken or condemned and lands granted, and while it must be admitted that the complainants' case does not fall within its precise words, for they own no upland adjoining the land taken by the defendants for their right of way, which is separated by the land occupied by the right of way, from tide-water, because, under the theory of fact on which the case is now being considered, the right of way occupies the whole of the upland or *ripa* covered by the complainants' title, still, I think, the statute has a very important bearing on this case. It puts in the form of positive law, what, prior to its enactment, existed only as a deduction to be made from a local custom or a principle of local common law. The statute was undoubtedly passed to clear up doubts, which it was thought might exist, respecting the rights of two different classes of persons in the same piece or tract of the public domain. There is nothing on it- face which indicates an intention, on the part of the legislature, to take anything from the riparian owner; on the contrary, its main purpose seems to be to make his rights more certain and secure. Nor was it designed to establish a new rule of law, for it never was the law, that the acquisition of a mere easement, by one person in the land of another, operated to transfer the fee, nor to deprive the owner of the servient land of the right of making any use of it which did not interfere with the full and free enjoyment of the easement. The principal design of the statute, as I read it, was to declare what before was, on general principles of law, entirely certain and clear, and that is, that the acquisition by a canal or railroad company of an easement, simply for a right of way over the lands of a riparian owner, along or on the shore of his lands, should not operate to deprive him of his right or equity to preserve and improve the connection of his land with tide-water.

If we adopt the construction above indicated, as the construc-

tion which this part of the defendants' charter must, as a matter of law, receive, it would seem to be entirely clear that, although the fact may be, just as the defendants say it is, that all of the *ripa* embraced within the complainants' title is now covered by the canal and tow-path, and has been so covered ever since the completion of the canal, still, as the complainants hold the fee in such *ripa*, and the defendants have no estate or right in it, except an easement over it, and as the complainants may exercise all of the privileges of a riparian owner over the land lying in front of such *ripa*, without, in the slightest degree, interfering with the defendants in the full and free use of their easement, or doing them any harm or injury, it is the duty of the court to adjudge, that, as between the parties to this suit, the title to the lands in dispute is in the complainants, subject, however, to an easement in favor of the defendants to use, as a part of their right of way, so much thereof as they held and occupied for twenty years or more prior to the time when this suit was instituted. That is my judgment as to the rights of the parties in the land in dispute, assuming the line of high water to be just where the defendants, by their answer, say it is.

But, I think, the complainants' right to the land in question, may, under the proofs, be adjudged to stand on a broader and stronger foundation than that just indicated. The defendants show no title to the subject of the dispute, as against any of the persons under whom the complainants claim, except such as arises from possession and use for over forty years. They have never used any of the land in dispute for any other purpose than as a part of their right of way, and if their right is to be limited by their user, it must necessarily be confined to a simple easement. The complainants say, by their bill, that the canal of the defendants, as located and constructed, did not extend to the shore line, or to ordinary high-water mark of the Passaic. Their claim is, that, after the completion of the canal, there existed between the foot of the slope of the tow-path and the high-water line of the Passaic, and lying right adjacent to the foot of the tow-path, a strip of land, varying in width from ten feet to forty, extending along the whole of the *locus in quo*, which was never touched by

the waters of the Passaic at an ordinary high tide.   This claim constituted the principal subject of contest on the hearing of the case, and a vast volume of evidence, embracing almost every variety of proof which it was possible to offer in elucidation of such an issue, was adduced, both in its support and refutation. To classify and arrange the whole body of the evidence produced on this branch of the case, and put it in a form to render it intelligible, so that its relative force and weight may be easily seen and appreciated, would extend this opinion much beyond the usual length of such a paper.   I shall not, therefore, attempt to do so; but, in stating the reasons for my judgment, shall content myself with simply calling attention to such parts of the evidence, as, in my opinion, serve to demonstrate, with the greatest force and directness, what the truth is respecting this claim. In this connection, I think, however, it should be stated, that the whole of the evidence touching this question, has been examined and considered with studious care, and that the effect produced on my mind, by that to which no allusion will be made, is, in its general result, precisely the same as that to which I propose to direct attention.

From 1833 to 1850, a period of about seventeen years, Mr. James H. Tichenor owned the land in question, and also a farm lying adjacent to it.   He resided on the farm from 1833 to 1836, and again from 1844 to 1849.   His farm lay east of the land in dispute, and in passing from his farm to Newark, and back again, he passed over the land in question, or by it.   From 1833 to 1836, he says, he passed over it or along the disputed territory almost daily, and subsequently, up to 1850, very frequently, and he swears, that during all that time there was a strip of land, varying in width from twenty feet to thirty, lying between the canal and the river, which was never covered by the water of an ordinary high tide.   As he was the owner of the land, it was natural that his observation of its condition should have been somewhat closer and more thorough than that of a person having no interest in it, and that his recollection of what he saw should be more perfect, and remain with him longer, than that of a person casually looking at the land, with neither interest nor object.

Mr. Tichenor conveyed the land in controversy, together with other land, to the New Jersey Exploring and Mining Company, on the 1st of May, 1850. Dunn & Thompson, who were engaged in surveying lands in the city of Newark from 1844 to 1856, in June, 1850, made a survey and map of the land so conveyed. Mr. Dunn is dead, but Mr. Thompson is living, and was examined as a witness in this case. After an examination of the map, made by his firm in 1850, Mr. Thompson testified that the map was made from an actual survey, which he and Mr. Dunn made together, and that his recollection was, that, at the time the survey was made, there was a strip of land, from ten feet to thirty and upwards in width, lying north of the foot of the tow-path, extending along nearly the whole of the *locus in quo*, which was not covered by water at an ordinary high tide.

Mr. Eliphalet C. Smith, who was assistant surveyor of the city of Newark from 1837 to 1839, and city surveyor from 1843 to 1848, and assistant engineer on that part of the canal extending from Newark to the waters of the Hudson, from 1833 to 1835, testified, that while engaged on the canal, he resided in the city of Newark, and that in going to and from the point where his duties required him to be, he passed every day on the tow-path along the place in dispute, and also, that, while he was assistant surveyor of the city of Newark, he made surveys on the disputed territory, for the purpose of collecting material to be used in making a map of the city of Newark, and that in collecting such material he was necessarily required to measure the distance, at the place in dispute, from the foot of the tow-path to the high-water line of the Passaic. He swears, that after the completion of the canal, there was no point on the lands in dispute, where the foot of the tow-path was coincident with the high-water line; that it would not have been good policy to have located the tow-path, so that tide-water, at high tide, would have washed it, but his recollection is, that, between the bottom of the tow-path and the high-water line, there was a strip of upland, varying in width from ten feet to thirty. Dr. Alexander, the superintendent of the Chemical Works, whose testimony, in consequence of his caution, strong sense of justice, and high

regard for the truth, is, in my judgment, entitled to the very highest consideration, says, that after 1872, and before the filling in was done, there existed at the line of the Chemical Works, extending westerly for the distance of four or five blocks, quite a little strip of land between the bottom of the slope of the tow-path and the high-water line of the Passaic.   There is a large amount of other evidence, on the part of the complainants, of the same general character.   Stated in its substance, it shows that there was, between the foot of the tow-path and the waters of the Passaic, along the whole of the disputed territory, from the time the canal was built until tide-water was excluded by the filling in, a considerable strip of upland which the waters of an ordinary high tide never touched.   If this evidence is believed, there can be no doubt about the complainants' right to a decree. It establishes the fact that there was a sufficient *ripa* lying north of the tow-path, to entitle the complainants to be regarded as riparian owners.

The defendants' evidence on this branch of the case, quite equals in bulk, if not in weight, the evidence of the complainants. They show, by many witnesses, some of them gentlemen of prominence and high respectability, that, on the completion of the canal, the foot of the tow-path, along the whole of the territory in dispute, was either coincident with the high-water line of the Passaic, or extended below it into the river.   Mr. Roswell B. Mason, who had charge of the location of the route of that part of the canal extending from Newark to the waters of the Hudson, swears, that after the tow-path was built, there was no land between the foot of the tow-path and the high-water line, at any point on the disputed territory, but that in many places the tow-path was built on land which was covered by tide-water at an ordinary high tide.   His brother, Mr. Arnold G. Mason, who assisted as an engineer in constructing this part of the canal, gave substantially similar evidence.   But neither of these gentlemen, until just before he gave his testimony, had seen the *locus in quo* for over forty-five years.   In the interval, the disputed territory, and all its surroundings, had undergone many and very great changes.   During nearly the whole of this long period,

both of them resided at points remote from the place in question,. and so far as appears, nothing had occurred, during its lapse, which directed their attention to it in such manner as to have the least tendency to either freshen or preserve their recollection of its condition when they left it.    That they believe that they retain anything like an accurate recollection of the situation, under the circumstances, seems to me to be quite extraordinary, for I think that the observation and experience of most men, especially those living busy and active lives, show that, where a person possessing only an ordinary memory, is deprived of all opportunity, for over forty years, of seeing, at intervals, a particular place or situation, with which he was once familiar, and nothing has occurred in the *interim*, to direct his attention to it, and cause him to think about it, and thus preserve his recollection of it, before the lapse of half the period named, every trace of the picture, which at one time existed in a perfect state on his memory, will be so far obliterated, that if he attempts to reproduce it he will be compelled, in many important parts, to substitute fancy for fact.    And it is possible for him to do so without being fully conscious that he is fabricating, for, if he has a dim recollection of a part of the picture, his imagination will suggest what the balance of it ought to be, and it will, therefore, be easy for him, in his effort to revive his recollection, to mistake what is purely the work of his imagination for recollection.

As already stated, many other witnesses called by the defendants gave evidence, which, in its substance, is identical with that given by the Messrs. Mason.    They nearly all swear that, after the completion of the canal, the foot of the tow-path was either coincident with the high-water line or extended below it.    They are all persons of such character and standing as entitles their testimony to full consideration.    But the vital fact, as they state it, appears to me to be so improbable, that their evidence, especially when contrasted with that produced by the complainants, must be rejected as incredible.    I do not believe that any civil engineer of sufficient reputed capacity to be placed in charge of so important a work as the construction of this canal, would have located the foot of its tow-path at the high-water line, on a

stream like the Passaic, except under the pressure of reasons so imperative in their character as to leave no other location open to him. None such seem to have existed in this case, and if the tow-path was located where the defendants' witnesses say it was, it was put there from choice and not from necessity. That it should have been done from choice, in view of the actual condition of affairs then existing, as the proofs, about which there is no dispute, show, is a thing which, I think, is incapable of belief by any discriminating mind. The Passaic is subject to freshets, its waters at such times rising to a very considerable height. The trend of the river, at the place in question, at the time the canal was built, was towards the canal, the river at that point lying somewhat in the form of a half circle, with the top of the curve or its greatest extension nearly opposite the middle of the *locus in quo*. The channel of the river ran near its south bank, and the main force of its current struck against that bank. Mr. David H. Tichenor, one of the defendants' witnesses, in describing the river and its shore, at the point in question, just before the construction of the canal, says, that there was more current there than either above or below, and that after heavy rains the current bore against the south bank and wore it away. Land, at the place in question, was very cheap when the canal was built, the defendants in no instance being required to pay, on a condemnation valuation, more than $15 an acre, including damages, and in some instances only $5 an acre. The tow-path, at this point, was constructed of loose earth, taken from the excavation made for the bed of the canal. If it had been located where the defendants say it was, it is as certain as anything can be which is governed by the law of nature, that the very first considerable freshet which occurred in the Passaic, after it was built, would have swept it away. That it never was washed away by a freshet, demonstrates, as I think, quite conclusively, that it was located above the high-water line. Competent engineering, as well as ordinary good sense, would have located it there. I have no doubt it was located there.

The proofs, in my opinion, fully establish the fact that there was and is a *ripa* north of the foot of the tow-path, along the

whole of the territory in dispute, sufficient in extent to constitute the complainants riparian owners. This conclusion renders it unnecessary to consider any of the many questions started by the defence, on the assumption that no such *ripa* existed.

The complainants are entitled to a decree, adjudging that they hold the land in dispute by a good and valid title, and that the defendants have no right or interest in it, except a right of way for their canal and tow-path, over so much of it as their canal and tow-path now occupy.

The complainants are also entitled to costs.