34 N.J. Super. 228 (1955)
112 A.2d 3
FREDERICK C. BAILEY, PLAINTIFF-APPELLANT,
v.
ALFRED E. DRISCOLL, GOVERNOR OF THE STATE OF NEW JERSEY, THEODORE D. PARSONS, ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY, CHARLES R. ERDMAN, JR., COMMISSIONER OF CONSERVATION AND ECONOMIC DEVELOPMENT OF THE STATE OF NEW JERSEY, WAYNE D. McMURRAY, E.M. MADDOCK, WILLIAM C. COPE, H.L. DERBY, GRACE F. RUSSELL, FRANCIS V. LOWDEN AND J.C. CONKLIN, JR., MEMBERS OF THE COUNCIL OF THE DIVISION OF PLANNING AND DEVELOPMENT OF THE DEPARTMENT OF CONSERVATION AND ECONOMIC DEVELOPMENT OF THE STATE OF NEW JERSEY, AND CHARLES T. KLINE, JR., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 28, 1954.
Decided February 23, 1955.
*233 Before Judges JAYNE, STANTON and HALL.
Mr. Chester Mueller argued the cause for the appellant.
Mr. Vincent A. Grasso argued the cause for the respondent Kline (Mr. William T. Hiering, attorney).
No brief was filed or argument made on behalf of the other respondents.
The opinion of the court was delivered by HALL, J.S.C. (temporarily assigned).
The plaintiff appeals from a judgment of the Chancery Division denying him relief with respect to a grant of lands under tidewater to defendant Kline by the Department of Conservation and *234 Economic Development of the State through the Council of the Division of Planning and Development thereof. There is involved an unusual physical situation and questions of the rights of riparian owners which do not appear to have been heretofore directly passed upon by our courts.
The case was tried below upon a somewhat sparse stipulation of facts and exhibits. The court rendered an oral opinion at the conclusion of the trial and made no other findings of fact and conclusions of law. From the stipulations, exhibits, pleadings, and admissions of counsel in argument both below and in this court, we derive the following summary of the case:
Since 1926 plaintiff has been the owner of two islands lying in Barnegat Bay. We are concerned only with the larger of the two, comprising slightly over five acres, which originally was separated from the upland or mainland on the easterly shore of the bay in the Ortley Beach section of Dover Township, Ocean County, by an arm of the bay known as Muscrat (or Muskrat) Creek, which had both its origin and terminus in the bay. As shown by the Division map in evidence, this so-called creek, before the events to be detailed, flowed around the east end of the island and cut into the mainland opposite it in a general semi-circular fashion so that the distance between the mean high water level of the island and that of the mainland, i.e., the width of the water-filled creek at mean high tide, was approximately 250 feet at the widest point and 150 feet at the narrowest. There is nothing to indicate the location of the low water mark with respect either to the island or the mainland or that exterior bulkhead or piers had been fixed as to the mainland. There is a line drawn around the end of the island, east of the mean high water line, designated as "future pierhead and bulkhead line," which we assume to have been fixed and established by the Council (see R.S. 12:3-19).
It was stipulated that Kline "is the owner of lands on the mainland, encircling plaintiff's island, except the bed of Bay Boulevard," which was constructed by Ocean County after *235 1945. This road occupies a good part of the bed of the creek on a fill, as will presently be more fully detailed. We construe this stipulation to mean that Kline has owned, at least since 1945, the lands on the mainland shore of the creek in its entire semi-circular course around the easterly end of plaintiff's island, extending to what was the mean high water line of the mainland prior to the physical events that have occurred in the area since 1945.
As of the latter year, three public streets on the mainland, Second Avenue, Shuster Avenue, and Third Avenue, had their westerly terminus at the mean high water line opposite plaintiff's island. In 1948, the public rights in Second and Third Avenues were vacated. Shuster Avenue remains as a public street, but since the construction of the boulevard has its westerly terminus at the easterly right-of-way line thereof.
As has been indicated, some time between 1945 and 1950, the County of Ocean built a new highway, called Bay Boulevard, along the east shore of the bay from Seaside Heights to Lavallette, the 100-foot wide right-of-way of which crossed the arc of the semi-circle made by the waters of Muscrat Creek and occupied on fill a large portion of the bed thereof between plaintiff's island and the mainland. The westerly side line of the road as laid out comes within about 60 feet of the mean high water line of plaintiff's island at its nearest point and the easterly side line is approximately 50 feet west of the mean high water line of the mainland at its farthest point therefrom. The westerly side line of the new road is, therefore, located west of the center line or thread of the creek for a distance of about 150 feet in front of the island and there remains a small unconnected portion of the bed of the creek between the east side line of the road and the shoreline for a north-south distance of about 200 feet. For this distance, the road lies entirely west of Kline's lands; otherwise it runs through them.
To make this highway construction possible, the plaintiff executed and delivered an instrument to the county, dated December 18, 1945, whereby he released "any rights I have *236 or may have in and to the waters of Muscrat Creek." The document recited as the reason for it that the state agency would not make the necessary riparian grants to the county for the bed of the new road where it passed through the creek because plaintiff might have some rights in and to the waters of it lying east of his island. The proposed road was described not only with respect to the area covered by its 100-foot right-of-way, but also to include slope rights on land on each side thereof sufficient to permit slopes of five foot horizontal to one foot vertical as required by the elevation of the surface of the road. While the releasing clause is general, it must be read in the light of the recitals and we construe it, as have counsel in their arguments, to constitute a release of such portions of his rights only as were necessary to construct the boulevard in the location and manner described therein.
About the same time, by instrument dated December 31, 1945, describing the same right-of-way and adjacent slope rights, Kline and other upland owners along the entire highway route released to the county "any right we may have in and to the waters of Barnegat Bay lying East of the East line of the proposed Bay Boulevard," on recitals that the road would at several places cross the waters of the bay and its tributaries and thereby leave certain waters thereof lying east of the road closed off without access to the main body of the bay and that the necessary riparian grants would not be made to the county for the bed of the boulevard because upland owners might have some rights to that portion of the bay and its tributaries so closed. It is to be noted that this instrument does not expressly encompass a release of any rights in and to the waters of the creek west of the easterly side line of the road, as did the plaintiff's release. Whether another instrument to effect such a release was given or this document construed to cover it is not expressly disclosed by the proofs, but we will assume that Kline has no rights in the former tidewater land now occupied by the boulevard, and that such are now in the county and that ownership of *237 the land west of the boulevard remained in the State, subject to the county's slope rights, until the grant in question was made to Kline.
The record is also entirely barren of any evidence as to whether the county thereafter obtained from the state agency grants covering the right-of-way, adjacent slope rights and permission to fill in adjoining lands, and if so, the exact extent thereof, but we assume it must have, for the road was constructed along the right of way described. Moreover, as a result of the construction and presumably of the necessary fill in connection with it, the creek bed has become completely filled between the easterly end of the island and the westerly right-of-way line of the highway. In other words, plaintiff's island is no longer an island but a peninsula of the mainland, and Muscrat Creek is no longer a continuous arm of the bay encircling the easterly side of the island, but has become two arms, separated by the island, each terminating at the westerly edge of the fill. As far as the proofs show, the filled land connecting the island with the boulevard was, at the completion of the highway construction, still owned by the State as land formerly under tidewater.
With the physical situation in this posture, Kline made written application, dated February 6, 1950, to the Division of Planning and Development of the State Department of Conservation and Economic Development for a grant in fee simple of the land under tidewater adjacent to and in front of a long list of parcels described by lot and block number therein, of which he stated he was the owner. He further represented therein that the described parcels adjoined the tidal waters of Muscrat Creek, but above the high water mark thereof. The proofs do not disclose the location of the listed lots, but we assume that they touch upon and include what was, before the boulevard was built, the entire mainland shore line along the semi-circle made by the indentation of the creek from a point on the shore northerly of plaintiff's island and about 60 feet west of the westerly side line of the highway to a point on the shore southerly of the island and *238 about 60 feet west of the westerly side line. It should be here noted that, since the building of the highway, Kline's lands, except for this 60-foot distance on the north and south ends of the arc west of the highway, have been separated from the main waters of the creek by the highway and by that small portion of the creek closed off and lying between the road and the mainland.
By instrument dated September 11, 1950, Kline received a grant from the Council of the Division, presumably based on his application. This is the grant here under attack. It was executed by the individually named defendants other than Kline, who are the members of the Council, the Governor, the Commissioner of the Department, and the Attorney-General. The instrument recites as a basis for the conveyance that Kline represented he was the owner of lands fronting on Muscrat Creek in front of which the granted lands are situated. A consideration of $330 for the grant is also recited.
A conveyance in fee follows "in and to the lands now or formerly flowed by tidewater at mean high tide of Muscrat Creek" described by metes and bounds. The land so conveyed comprises a strip with parallel east and west boundaries running across the arc of the semi-circle of what was previously the bed of the creek and immediately adjacent to the boulevard on the west. It runs from Kline's shore land on the northerly side of the arc west of the highway to his land similarly situated on the south side and varies in depth (from east to west) from 25 feet to 60 feet. The length of the easterly line thereof along the boulevard is approximately 450 feet from north to south and that of the westerly line about 577 feet by reason of the curvature of the shoreline. It is significant that, for a distance of 140 feet directly in front of the east end of plaintiff's island, the depth of the grant is, by an indentation in the westerly boundary, reduced to 25 feet, which brings the westerly boundary only about 25 or 30 feet from the nearest point of the mean high water line of the island. If it were not for this indentation, the *239 westerly boundary of the grant would practically touch the mean high water line of the island at one point. Therefore, by the indentation, a rectangular piece of land about 140 feet long by 25 or 30 feet deep is still retained by the State between the westerly line of the grant at this point and the easterly end of the island. This piece, as has been said, is filled land and not covered by water. It is important to note that no part of the grant touches or adjoins Kline's land east of the boulevard; its only connection with his other property is at its northerly and southerly ends west of the road. Moreover, the land comprising the grant is all solid, filled ground, and a large part of it, including that portion nearest the island, lies on plaintiff's side of what was the centerline or thread of the creek as it existed before the highway construction.
The instrument of grant further recites that it is made and accepted with full cognizance "of the artificial fill placed upon the lands by the County of Ocean for the protection of Bay Boulevard," and then goes on somewhat contradictingly to give the right to exclude tidewater from the land conveyed and thereby appropriate the lands under water to the grantee's own exclusive use after obtaining approval therefor from the Department, and until such filling, it is stated that the grant is made subject to the natural rights of the public to the use of the waters flowing over the same and to temporarily anchor thereon.
Finally, the instrument gives only a conditional grant: "this grant is upon the condition and limitation: that if the said Charles T. Kline, Jr. is not the owner of the upland adjoining the land under tidewater hereby granted, then, and in that event, this conveyance and all the covenants herein on the part of the State shall be void; * * *."
Thereafter, Kline received a permit from the Division, dated January 2, 1951, allowing him for one year to maintain the existing fill on the conveyed lands, subject to the conditions of the grant. No proof of annual renewal thereof is found in the record, but we are assuming such to have been obtained.
*240 It is conceded that Kline did not give any formal six months' notice to plaintiff of his application for the grant as the statutory provisions (of which more hereafter) require when one other than a riparian owner seeks a grant from the State. The plaintiff had actual knowledge thereof, but Kline admits such is not sufficient to comply with the statute if applicable.
Some time in 1950, whether before or after Kline's application was filed, we are not told, the plaintiff applied to the Division for a grant of lands under tidewater, presumably those surrounding his islands, which included in part the lands granted to Kline. The Division denied the application by letter dated January 31, 1951, more than four months after the grant to Kline, wherein it was stated that it "will not be approved," without any reason being assigned.
The final effect of the highway construction with adjacent fill and the grant to Kline is that although plaintiff's island is no longer such, but in fact a peninsula, made possible by his release of rights to Ocean County for the building of Bay Boulevard, he cannot get from the former island to the public boulevard across the filled land between, because about half of that filled land, which all lies on plaintiff's side of the thread of the former creek, has been conveyed by the State to Kline. If this intervening strip was still the property of the State, he would have the natural right, in common with other members of the public, to pass over it to reach the boulevard to the same extent as he would have had if it remained water (specifically recognized and reserved in the grant to Kline) and to the same extent as he could have gone by boat from his island to the mainland at the high water line terminus of Shuster Avenue before the boulevard was built. To put it plainly, as counsel for defendant Kline candidly admitted at the oral argument, Bailey's island is now of no real practical value to him or any one except Kline since the latter owns by the grant an intervening strip of land blocking access from the former island to the boulevard. Of course, the plaintiff has no remedy to relieve this unfortunate *241 situation unless he has rights which have been wrongfully affected or the grant to Kline is invalid.
The plaintiff sought relief in this action commenced in January 1953. By his complaint he prayed that the grant to Kline be declared invalid and void, in whole or in part, on various grounds and that the defendant state officials be enjoined from conveying that portion of the granted lands to which he claimed a prior right to any person but himself. The grounds for relief finally relied upon below posed the following questions to the lower court on the theory on which the case was tried:
1. Whether the grant was invalid in toto by reason of the erroneous recital therein of the statutory authority for it.
2. Whether Kline took any rights by the grant insofar as it purported to convey any lands on the island side of the thread or center line of the creek, either on the theory that plaintiff has a preemptive right thereto voiding a grant to any one else, absent the statutory six months' notice to him, or that the principle of equitable apportionment of conflicting preemptive rights requires the same result.
The lower court refused to consider the first question, determining that it had no jurisdiction and that the claim could only be raised by appeal to this court from the action of the Division, as a state administrative agency, authorizing the grant, under R.R. 4:88-8.
On the second question, the Chancery Division held that it had jurisdiction as a court of equity to determine, as between the alleged upland owner and the island owner, whether the former took any rights under the grant beyond the center line in which the latter claimed a preemptive right. The trial judge then went on to treat the grant by the Division on the same basis as any other action by an administrative agency with a presumption in favor of its propriety. He found no violation of statutory authority in the extent of the lands conveyed by it and held that such extent was a matter entirely within the discretion of the Division, subject to judicial correction only for abuse or unreasonable exercise, which was *242 found not to have been established. The plaintiff was consequently denied all relief.
The state officer defendants alleged in their answer that the action was in fact a suit against the State to the extent that it sought injunctive relief against them and so without the jurisdiction of the court. This contention was also set forth in the pretrial order. They did not attend the trial, advising the court by letter that their legal position was identical with that of Kline and that the latter's attorney was authorized to present the case on behalf of all defendants. The point was not argued below, so we assume that any defense of immunity from suit was abandoned prior to trial. The trial court did, however, in its oral opinion on its initiative, hold the state officials, including the Council members, to be immune from suit as individuals, in which capacity he conceived them to be named in the action, and directed that the action should be dismissed as to them. He went on to say, in effect, that the Division or its Council was a proper party, with which we agree.
We do not apprehend that these state officials were sued here in their individual capacities, since, although named individually, they were described according to their official positions or titles. The power and authority to make grants or leases of state-owned lands under tidewater now rests, by legislative designation, in the Planning and Development Council of the Division of Planning and Development of the Department of Conservation and Economic Development, subject to the approval of the Governor and the Commissioner of the Department. L. 1948, c. 448, §§ 6, 7, 10 and 13; N.J.S.A. 13:1B-6, 7, 10 and 13. Even though we do not think it was improper to designate the council members as such by their individual names instead of as a body, in the light of the trial court's ruling the Council should have been substituted as a party defendant under R.R. 4:34. The Governor and Commissioner were not at all necessary parties in view of their limited statutory function. However, no substitution of the Council for its individual members was *243 made and the judgment dismissed the suit against all defendants but Kline. This action is not urged to us as a ground for reversal. The state officials did not file a brief with us or make an appearance at the oral argument, although duly served with the notice of appeal. Since our determination of the case otherwise requires a reversal and remand, we direct that the court below shall order the Council substituted as a party defendant in place of its individual members in order that complete relief may be afforded.
We proceed to the first of the two main questions presented to us. Kline's instrument of grant, in one of its preliminary recitals, states that he had applied for a grant "pursuant to Title 12, Chapter 3, Section 7, of the Revised Statutes of 1937, and the amendments thereof and supplements thereto." As a matter of fact, his application contained no mention of any express statutory section as the authority for the requested conveyance. The section cited in the instrument is admittedly erroneous since that section refers only to lands under the tidewaters of the Hudson River, New York Bay and Kill von Kull. Other sections (R.S. 12:3-10 and 12:3-23) authorize grants of such lands in other parts of the State, including Barnegat Bay. Plaintiff alleged that this error invalidated the entire grant. As has been said, the court below refused to pass on the contention on the ground that it could be raised only on appeal to this court from the action of the state agency pursuant to R.R. 4:88-8. Plaintiff urges to us that this view of the trial court is erroneous and that we should hold the grant invalid ab initio by reason of the incorrect statutory reference.
Preliminarily, may it be said that it is extremely doubtful that the plaintiff has the standing to attack the grant on this ground. It would appear that only the State could seek to take advantage of it. Cf. American Dock & Improvement Co. v. Trustees for Support of Public Schools, 39 N.J. Eq. 409, 418 (Ch. 1885).
But passing that point, the reason stated by the trial court requires us to consider the jurisdiction of the Chancery *244 Division to entertain this suit at all, which, in turn, involves a review of the methods and remedies available to attack a grant on any ground, including the claim that it is void because the grantee is not the owner of the upland adjoining the lands granted. Unquestionably, the attack may be made directly by the Attorney-General in an action brought against the grantee to which the state agency is not a party, either under a statute passed in 1907, now N.J.S. 2A:62-23 et seq. (Attorney-General v. Goetchius, 142 N.J. Eq. 636 (Ch. 1948)), or inherently by information in equity on the relation of the aggrieved private party (Attorney-General v. Central Railroad Co. of N.J., 61 N.J. Eq. 259 (Ch. 1901); Attorney-General v. Morris & Cummings Dredging Co., 64 N.J. Eq. 555 (Ch. 1903), affirmed 69 N.J. Eq. 829 (E. & A. 1905)). Equally clear is the availability of collateral attack by an aggrieved party against a grantee through an action sounding in trespass or ejectment. Polhemus v. Bateman, 60 N.J.L. 163 (E. & A. 1897); Van Schaick v. Board of Riparian Commissioners, 82 N.J.L. 219 (Sup. Ct. 1912).
It has been held, under our former practice, that an owner of the ripa may bring certiorari to call in question the action of the agency in making a grant to another without the requisite statutory notice to him. Shamberg v. Board of Riparian Commissioners, 72 N.J.L. 132, 135 (Sup. Ct. 1905); Empire Trust Co. v. Board of Commerce and Navigation, 124 N.J.L. 406, 411 (Sup. Ct. 1940). Under the new practice, an action in lieu of prerogative writ would lie, here by direct appeal to this court from the state agency under R.R. 4:88-8 within the time limit prescribed by R.R. 1:3-1(b). So plaintiff had this remedy available to him, but is it exclusive?
The effectiveness of the remedy by prerogative writ is most questionable. This state agency is acting in a quasi-legislative rather than in a quasi-judicial capacity. The aggrieved person is not a party to the action before the Division. He may not learn of it until years later, long after the limitation *245 period imposed by R.R. 1:3-1(b) has expired. The statute itself permits a riparian owner, under certain circumstances, to seek relief from the agency itself within five years of the time a grantee improves the granted lands. R.S. 12:3-45 et seq. In fact, it has been cogently suggested that the agency has no power to determine the state of the title to the upland. Ocean City Association v. Shriver, 64 N.J.L. 550, 565 (E. & A. 1900). This may well be the reason why a grant is made only on condition that if the grantee is not the owner of the adjoining upland, it shall be void. Moreover, the writ of certiorari, or an action in lieu thereof, can attack only the action of the board in making the grant and not the grant itself. The result can only undermine, not annul. Van Schaick v. Board of Riparian Commissioners, supra, 82 N.J.L., at p. 221. An application for certiorari has been denied and the action transferred to equity so that complete relief could be given. Harz v. Board of Commerce and Navigation, 126 N.J. Eq. 9 (Ch. 1939), affirmed 127 N.J. Eq. 341 (E. & A. 1940). The power of the equity court in this situation is broader and more flexible than is available at law. American Dock & Improvement Co. v. Trustees for Support of Public Schools, supra, 39 N.J. Eq., at page 449.
It follows that an aggrieved party also has the remedy of an action in equity, of which the Chancery Division has jurisdiction, to declare a grant void, at least where other relief of an equitable nature is sought, as it was in the instant case. Harz v. Board of Commerce and Navigation, supra. In the most recent case dealing with this subject matter, apparently the only relief prayed for was a declaration of title and jurisdiction was not questioned. Leonard v. State Highway Department, 24 N.J. Super. 376 (Ch. Div. 1953), affirmed 29 N.J. Super. 188 (App. Div. 1954). In both of these cases, the state agency was a party defendant.
We conclude, therefore, that the plaintiff's right to appeal under R.R. 4:88-8 was not his exclusive remedy and that the court below did have jurisdiction of the present action, not only to pass upon the effect of the grant, but also the *246 question of its inherent validity on the ground that the statutory authority therefor was erroneously recited in the instrument.
We return to a determination of this question, assuming the plaintiff had sufficient standing to raise it. There is no requirement that a grant must recite any statutory authority at all in order to give it validity. If the authority in fact exists, the grant is valid without any recital. It must be considered in its entirety. Both the granting and habendum clauses indicate a clear intention to make a conveyance of described lands, subject to certain conditions. It must be deemed to be as comprehensive as any applicable statute would permit. So an erroneous recital of statutory authority may be disregarded and a grant is not invalidated thereby. City of Elizabeth v. Central R. Co., 53 N.J.L. 491, 497 (Sup. Ct. 1891).
The second question poses the principal problem in the case. Is the grant effective with respect to land conveyed thereby lying west of the former center line of the creek? We apprehend that the outward limit of a grant upon a relatively narrow tidal stream has not heretofore been passed upon by the courts of this State.
In order to put the problem in its proper focus, it is desirable to consider briefly the development and present state of our law concerning tidewater lands and the so-called "riparian rights" of owners whose properties adjoin the same.
It is the long-settled law of this State that the title of an owner of lands adjoining tidewater extends only to the mean high water line. This is to be contrasted with an owner bordering on a non-tidal stream whose title runs to the middle or thread thereof. Ross v. Mayor and Council of Borough of Edgewater, 115 N.J.L. 477, 483 (Sup. Ct. 1935), affirmed 116 N.J.L. 447 (E. & A. 1936). Owners of both classifications of waters have been referred to indiscriminately in our decisions as "riparian owners" and their so-called rights concerning the adjoining waters and land thereunder as "riparian rights." In passing, it might be noted *247 that the term "riparian" should refer more precisely only to watercourses and lakes and the word "littoral" to seas, oceans and the like. 4 Restatement, Torts, § 843a.
Equally well settled since the landmark opinion of Chief Justice Beasley in Stevens v. Paterson & Newark R.R. Co., 34 N.J.L. 532 (E. & A. 1870), is that, by the common law, the ownership of all lands under tidewater below high water mark within the territorial limits of the State belonged to the Crown of England, did not pass to the proprietors of New Jersey under the grant from the Duke of York, and became vested by the Revolution in the sovereignty of the State under the guardianship of the Legislature. Ross v. Mayor and Council of Borough of Edgewater, supra. New Jersey applies the tidal test  the law of England  as distinct from that of navigability, which is the criterion of federal power also used in many other states, to determine in what waters and lands thereunder the property is in the sovereign. Cobb v. Davenport, 32 N.J.L. 369, 378 (Sup. Ct. 1867). This is in line with the established principles that each state is at liberty, subject to the paramount power of the Federal Government to control navigation to the extent necessary for the regulation of commerce and constitutional limitations upon interference with vested rights, to determine over what submerged lands its sovereign prerogative of ownership shall be exercised (56 Am. Jur. § 461) and that each state may similarly deal with such lands "according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public * * *." 56 Am. Jur. § 471, p. 884.
The Stevens case held that, by the English common law followed in New Jersey, there were no public rights in navigable (tidal) waters which it was beyond the power of the Legislature to impair or vacate, although until the Legislature acted, the public did have a common right of navigation and fishery. By the same case, it was definitely established *248 that a riparian owner has no rights at common law, except alluvion and dereliction, in such waters or the lands under them, beyond those of the public generally, even including unimpaired access thereto, merely by reason of his ownership of the ripa (cf. Bouquet v. Hackensack Water Co., 90 N.J.L. 203 (E. & A. 1916)), but that by the local common law of the State a riparian owner might appropriate such lands between the high and low water marks in front of his property as his own by wharfing out and filling in, so long as no public nuisance was thereby created, and when he had done so, he acquired an indefeasible right therein beyond the power of the Legislature to abrogate. Such local custom was nothing more than a license, which, when executed, became irrevocable. This local custom was recognized and affirmed by our earliest legislation  the Wharf Act of 1851 (L. 1851, p. 335; Rev. 1877, p. 1240).
The result of these basic concepts was that the Legislature could do what it pleased with its lands under tidewater as far as the adjoining riparian owner was concerned unless the latter had already exercised his privilege of wharfing or reclamation. It could grant the same in fee or any interest or rights therein to him or to any one else who could thereby render valueless the natural locational advantage of the owner of the ripa. It could refuse to convey at all. The price exacted was entirely within its control. Prior to the general legislation on riparian grants now to be mentioned, the fee or rights therein were granted by special enactments. It should be pointed out, however, that Chief Justice Beasley observed in Keyport & M.P. Steamboat Co. v. Farmers' Transportation Co., 18 N.J. Eq. 511, 516 (E. & A. 1866) that "the public sentiment, from the earliest times to this day, and the whole course of legislative action in this state, have recognized a natural equity, so to speak, in the riparian owner to preserve and improve the connection of his property with the navigable water, * * *."
Our statutes on leases, grants and conveyances of riparian lands in general (Revised Statutes 1937, Title 12, chapter 3, *249 article 1, subdivision A, consisting in large part of a mere recitation of the various acts in chronological order) are somewhat confusing and require careful analysis to determine the exact legislative situation today.
By L. 1869, c. 383, p. 1017 (Rev. 1877, p. 982; R.S. 12:3-2 to 12:3-9, inclusive), the Legislature dealt with lands under the tidewaters of the Hudson River, New York Bay and Kill von Kull, through all of which the state boundary runs. This act adopted exterior bulkhead and pier lines therein filed by the board of riparian commissioners created for the purpose by L. 1864, c. 391, p. 681 (Rev. 1877, p. 981; saved from repeal R.S. 12:3-1) and repealed the Wharf Act of 1851, supra, with respect to these waters. The repealer expressly provided that the prior local common law right of wharfing and reclamation in front of one's property was thereby not restored, and prohibited future erection of structures or reclamation without the permission of this body (R.S. 12:3-4). Prior special legislative grants were recognized (R.S. 12:3-5).
Most important, the act (R.S. 12:3-7) authorized the board upon application to grant in fee or on lease, for a consideration to be fixed by it, such of these lands under water "within the exterior lines" as it chose to dispose of with the right in the grantee to improve and reclaim the same. It was further provided that "no grant or license shall be granted to any other than a riparian proprietor, until six calendar months after the riparian proprietors shall have been personally notified in writing by the applicant for such grant or license, and shall have neglected" himself to apply for it. When the applicant was a stranger and the riparian owners had neglected to apply following the notice, the grantee could not fill up or improve the lands granted to him until the rights and interests of the riparian owner, if any, were extinguished and compensation paid him therefor through procedure specified in the Act. R.S. 12:3-9. This act applies only to the waters specified therein. Fitzgerald v. Faunce, 46 N.J.L. 536, 592-594 (E. & A. 1884).
*250 By this statute, the Legislature defined the extent of the "natural equity" in the riparian owner, three years previously spoken of by Chief Justice Beasley in the Keyport & M.P. Steamboat Co. case, supra, in this limited territorial area. This right in a riparian owner to a preference in the acquisition of the lands under tidewater adjoining his upland, in the event the State decided to convey them at all, later extended to other actions as we shall note, has come to be called by our courts a "preemptive right" or "right of preemption." See American Dock & Improvement Co. v. Trustees for Support of Public Schools, 39 N.J. Eq. 409, 414 (Ch. 1885); Landis v. Sea Isle City, 129 N.J. Eq. 217 (Ch. 1941). It is a property right in a sense, but not a vested one safe from legislative abrogation. As was said in the first cited case:
"The provision for notice to the riparian owner before sale to a stranger, was not the result of necessity, but was a gratuitous concession on the part of the state, which it had the power to withdraw as well. It was of grace and not of right." 39 N.J. Eq. at page 444.
Pamrapau Corp. v. City of Bayonne, 126 N.J. Eq. 479, 483-484 (Ch. 1939), affirmed 127 N.J. Eq. 340 (E. & A. 1940); 130 N.J. Eq. 240 (E. & A. 1941).
Provision for grants of land under tidewater in all other sections of the State than those specified in the 1869 act was first made by L. 1871, c. 256, p. 44 (Rev. 1877, p. 985; R.S. 12:3-10), which authorized the board to make a lease, grant or conveyance "with due regard to the interests of navigation" on the application of "any riparian owner on tidewaters in this State who is desirous to obtain" such "of any lands under water in front of his lands." It is to be noted that the grant or lease could be made only to the owner of the adjoining ripa, and that the extent thereof was not limited to the confines of any exterior bulkhead or pier line. The Wharf Act of 1851 still remained in effect.
Next in point of legislative chronology is L. 1871, c. 605, p. 113 (Rev. 1877, p. 988; R.S. 12:3-12) authorizing conveyances of state-owned lands formerly under tidewater but *251 which had become filled when the grant was applied for. Since this act was passed after that just previously referred to, it presumably applies to such lands throughout the State, although it is to be noted that it limits conveyances to such lands "lying between what was, at any time heretofore, the original high-water line and the exterior lines established or to be established."
By L. 1877, c. 77, p. 113 (Rev. 1877, p. 987; R.S. 12:3-18), it was enacted that a riparian owner did not lose his status as such as far as receiving a grant or lease was concerned where lands of his are taken or granted for a right-of-way so located on his lands "as to occupy the same along or on the shore line, thereby separating the upland of the riparian owner adjoining that used for the right of way from tidewater." This act was merely declaratory of the preexisting law. New Jersey Zinc & Iron Co. v. Morris Canal & Banking Co., 44 N.J. Eq. 398; 407-408 (Ch. 1888), affirmed 47 N.J. Eq. 598 (E. & A. 1890); Shamberg v. Board of Riparian Commissioners, supra. Counsel for Kline urges this section as a basis for the grant to him. We doubt its applicability since Bay Boulevard is constructed in large part in this area, not on his lands along the shore line, but in the bed of the creek. However, it is not necessary to decide the question, for Kline is the owner of uplands directly adjoining tidewater west of the boulevard at both the north and south ends of the semi-circle formed by the original course of the creek.
In 1891 came legislation concerning riparian lands around islands, which is of great pertinency in this case. L. 1891, c. 5, p. 15; R.S. 12:3-19 and 20. It was therein enacted that the board "shall * * * fix and establish, around or in front of all islands, reefs and shoals situate in the tidal waters of this state" exterior lines fixing the outer limit of piers, wharves, bulkheads and the like as well as interior lines delineating the permissible extent of solid filling. The act goes on to provide that the board "may sell or let to any applicant therefor any of the lands under water and below mean high water mark, embraced within the lines" so fixed *252 and established. R.S. 12:3-20. The section applies generally throughout the State. Most significant is the absence of any provision for a preemptive right in the riparian owner and the express limitation of the extent of a grant to lands within the exterior lines established.
Finally, we come to L. 1891, c. 123, p. 213 (Rev. 1877, p. 980; R.S. 12:3-23) which permits the grant or lease of lands in all sections of the State other than the areas already covered by the 1869 law "immediately adjoining the shore, to any applicant or applicants therefor other than the riparian or shore-owner or owners," provided the latter shall have received six months' previous notice of the application and have neglected himself to apply for and complete the grant within that period. In other words, we now find authority given the board to convey to non-riparian applicants, subject to the preemptive right of the shore owner, as to all submerged lands adjoining the mainland in the State by this act and the 1869 law, except that the outer limit of grants or leases is not confined to exterior bulkhead and pier lines except in the Hudson River-New York Bay-Kill von Kull area. The 1891 act also repealed the Wharf Act of 1851 as to the remaining part of the State (R.S. 12:3-4) on the same basis as had been done in 1869 for the territory covered by the statute of that year. Also, by express language, it did not affect the provisions of the earlier statute of 1891 governing riparian lands around islands.
Such is the course and state of our legislation as of the present date. To summarize: The inherent power of the State to grant or lease its lands under tidewater within its territorial limits has been delegated by the Legislature to the Planning and Development Council of the Division of Planning and Development of the Department of Conservation and Economic Development. The Council, subject to the approval of the Governor and the Commissioner of the Department, may grant or lease such lands to whom it will and for such consideration and on such terms as it may fix within the strict limits laid down by the Legislature. It may likewise *253 refuse to convey; a grant cannot be compelled by any one. If it does determine to grant or lease, one other than the owner of the adjoining shore, in the case of tidewater lands adjacent to the mainland, cannot receive an effective conveyance unless the owner of the ripa shall have neglected to apply for a grant himself after six months' notice; i.e., he fails to exercise his preemptive right. In the area involved in this suit, the statutes do not expressly limit the outward extent of a grant except to "lands under water in front of his lands" by R.S. 12:3-10 and to "lands * * * below mean high-water mark and immediately adjoining the shore" by R.S. 12:3-23, which we hold to be identical in meaning as far as the present action is concerned. There is no statutory limitation to the extremity of any exterior bulkhead or pier line. Conveyances of riparian lands around islands may be made to any applicant; i.e., the riparian owner has no preemptive right, but the extent of such a grant is limited to exterior pier and bulkhead lines which it is mandatory for the council to establish. R.S. 12:3-19 and 20. Any grant made in violation of terms and provisions of the legislative delegation is void, at least to the extent that it violates the statutory authority. Shamberg v. Board of Riparian Commissioners, supra; Harz v. Board of Commerce and Navigation, supra.
As we have pointed out, the trial court decided this case on the theory that the Council stood on the same basis as any state administrative agency and that there was no unreasonable exercise of discretion in its making the grant to Kline, since there was room enough left for a future grant to Bailey at the eastern end of his island. We believe this to be an erroneous theory. The problem is not one of abuse of discretion, but whether the Council acted within or without the statutory limitations with respect to the extent of the grant. Of course, the Council is entrusted with complete discretion as to whether it will convey anything and, if so, at what price, but that is not involved here. Having decided to grant lands to Kline, based upon his ownership of the *254 mainland west of the boulevard on both the north and south sides of the semi-circle, the problem is how far out can such a grant extend? In other words, what limitation has the Legislature put upon it? What is meant by the statutory phrases: "lands under water in front of his lands" or "lands * * * below mean high-water mark and immediately adjoining the shore" (R.S. 12:3-10 and 12:3-23) under the peculiar facts of this case? We are dealing only with statutory construction and interpretation and not with abuse or non-abuse of discretion. The Council either acted within the limits imposed upon it by the Legislature or it did not.
Moreover, the parties both in the court below and in this court, as well as the trial judge in his conclusions, assumed that the plaintiff had a preemptive right to any riparian grant of the lands around his island. This is incorrect, for as we have said, the one situation where our statutes give no right of preemption is in the case of an island. So we are not expressly concerned with any violation of a preemptive right or the resolving of allegedly conflicting rights. It follows that plaintiff was not entitled to a six months' notice of Kline's application and the latter's grant is not void for failure to give it. By the same token, there is no basis for the injunction Bailey sought to restrain the state agency from conveying the riparian lands around his island to any one but himself. However, the plaintiff has standing to attack the grant on other grounds since the physical facts clearly show he has suffered special injury by reason of the purported extent and effect of it.
It seems beyond question that the Legislature did not intend to empower a grant of submerged lands on a tidal river, creek or bay limitless in outward extent. The contrary interpretation would permit a grant to the far bank or close to it and would inevitably result in conflict with opposite riparian owners and possibly interference with public navigation and commerce. Approaching our particular problem from the island side, the statute permits only a grant to the outward limit of the exterior bulkhead and pier line. Beyond *255 that point, the Legislature has said that a grant cannot be made to any one. That prohibition must also have its limitation, as a matter of construction, or it would preclude or restrict the extent of a grant to the opposite mainland owner. Some line must be drawn beyond which neither the latter's grant on the one hand nor the legislative prohibition on the other can extend, so as to give effect to all provisions of the statutes.
Our courts have earlier been called upon to give more precise meaning to the same section of the law in connection with the conflicting rights of adjoining owners on the same shore of a body of tidewater due to the curvature of the shore line or the angle of the owners' side line with relation to the bank. In such cases, rules of law were expressly laid down, by way of statutory construction of the phrase "in front of his lands" to carry out the apparent legislative intent in the particular situation and to treat the respective owners equitably. These rules prescribe, despite the silence of or lack of detail in the statute, that where the waterfront is practically straight, the side lines are to run at right angles to it, and if curved, then in such manner as to divide the foreshore ratably among the littoral owners. Delaware, Lackawanna and Western R.R. Co. ads. Hannon, 37 N.J.L. 276 (Sup. Ct. 1875); Bradley v. McPherson, 58 A. 105 (Ch. 1904, not officially reported); Manufacturers' Land & Improvement Co. v. Board of Commerce & Navigation, 98 N.J.L. 638 (Sup. Ct. 1923).
In our opinion, the rule to be adopted, on the facts of the instant case, is that a grant to a mainland owner on an estuary or tributary wholly within the territorial limits of the State cannot extend beyond the center line or thread of the body of water. We therefore hold that the statutory phrase "lands under water in front of his lands" or "immediately adjoining the shore" must here be construed to be limited in outward extent by the center line of the stream. The prohibition against a grant beyond the island pier line will be likewise limited. This result is equitable and gives effect *256 to the whole of the statute. Analogy to support our conclusion is found in the long settled rule that the boundary line of opposite shore owners on a non-tidal river runs to the thread thereof  which likewise has a basis in equity and fairness. Ross v. Mayor and Council of Borough of Edgewater, supra. The Supreme Judicial Court of Massachusetts relied on the same analogy to support a rule that the boundary line between opposite riparian owners on a tidal stream, the bed of which was not in the particular case owned by the Commonwealth, although it has the same rule as New Jersey on ownership of lands flowed by tidewater, was the center line thereof. Tappen v. Boston Water Power Co., 157 Mass. 24, 31, N.E. 703, 16 L.R.A. 353 (1892).
The grant to Kline, extending from his uplands on the north and south sides of the creek west of the boulevard extends very considerably beyond the former center line of the creek; in fact, the conveyance extends over the whole area between the two opposite parcels which he owns. We hold that it is void to the extent that it attempts to convey lands on the island side of the former center line and Kline took no rights in such lands by virtue thereof.
The judgment below is reversed and the cause remanded with directions to the Chancery Division to order the substitution of the Council as a party defendant and to enter a judgment consistent with this opinion clearly limiting the extent of the grant to the former center line of Muscrat Creek upon proof being presented to it of the precise location thereof.